**Supreme Court**

No. 2013-311-Appeal.
(PC 06-4136)

Mathew M. Cote                    :

        v.                        :

John Aiello et al.                :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Mathew M. Cote                    :

v.                    :

John Aiello et al.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**   This case came before the Supreme Court on October 5, 2016, on appeal by the plaintiff, Mathew M. Cote[1] (plaintiff), from a Superior Court judgment, following a trial before a justice of the Superior Court sitting without a jury, that dismissed his complaint alleging breach of an implied contract, promissory estoppel, fraud, negligent misrepresentation, and unjust enrichment.  After a ten-day trial, the trial justice found for the defendants, John (Aiello) and Anna-Maria Aiello (Mrs. Aiello) (collectively, defendants or the Aiellos), on all claims,[2] declaring, inter alia, that the plaintiff failed to prove the existence of an implied contract to purchase the defendants' business, Richmond Ready-Mix (RRM), and that the promises made by Aiello to the plaintiff were not clear and unambiguous declarations to support a claim for promissory estoppel.  On appeal, the plaintiff argues that the trial justice

---

[1] The parties' names are spelt differently throughout the Superior Court record.  As a result, we will refer to the parties herein in accordance with the caption on the complaint.

[2] The trial justice did find in favor of plaintiff on the issue of liability on his unjust enrichment claim.  However, damages were not awarded, because plaintiff failed to present evidence on the appropriate measure of damages.  As a result, that claim was also dismissed.

erred by: (1) confining her analysis to the 1996 and 1999 conversations between the plaintiff and Aiello; (2) inappropriately speculating about the plaintiff's willingness to purchase RRM; (3) incorrectly concluding that the plaintiff did not detrimentally rely on Aiello's promises; (4) overlooking material evidence in considering the plaintiff's fraud and negligent misrepresentation claims; and (5) applying the incorrect measure of damages to the plaintiff's unjust enrichment claim. Because we are of the opinion that the trial justice did not overlook or misconceive material evidence and was not otherwise clearly wrong in dismissing the complaint, we affirm the judgment.

### Facts and Travel

The facts of this case recount a story of an employee who succumbed to his employer's promises about future events that never materialized. In 1986, after graduating from high school, plaintiff began working for Aiello's then-existing construction company, Aiello Construction. When Aiello closed the doors on that business in 1991, plaintiff was transferred to a sister company, Richmond Sand and Gravel (RS&G). The plaintiff terminated his employment with RS&G later that year because of the manner in which Aiello's son-in-law, Jeffrey Nero (Nero), was managing the company. Some years later, in May 1996, he was lured back when Aiello presented plaintiff with an opportunity first to return to RS&G and then to transfer to a sister company, RRM. Aiello sweetened the offer by explaining to plaintiff that he could purchase RRM in the future, although they did not discuss any terms of a potential purchase. The plaintiff was led to believe that Aiello owned RRM. He was not alone. Many years later it was revealed that Mrs. Aiello was the sole shareholder of the company, an ownership interest that both defendants had concealed.

After plaintiff accepted the employment opportunity, he and Aiello continued to enjoy a close personal relationship.[3]  In 1997, plaintiff was named president and vice president of RRM, and acted as its chief executive officer (CEO).  Over the years, Aiello made repeated references to the future, indicating that plaintiff would purchase RRM and Nero would purchase RS&G.  For example, in 1999, Aiello declared that when he was ready to retire he would sell RRM to plaintiff at fair market value and would structure a payment plan for him as well.  Although statements of this nature were made on several occasions, the details of any potential purchase were never discussed, nor were any contract terms explored by plaintiff.

Despite plaintiff's hard work and loyal service, Aiello sold RRM[4] to Peter Calcagni (Calcagni) for $1,829,800 on June 22, 2005.  The purchase agreement included a promise that plaintiff would be paid the sum of $50,000—which Calcagni was led to believe was a bonus but was actually a repayment of an outstanding loan from plaintiff to RRM.  On June 25, 2005, Aiello informed plaintiff that he had sold RRM to Calcagni.  The plaintiff became visibly distraught at this news; and, as Calcagni assumed control of the business, he remained frustrated.  The plaintiff continued to work for Calcagni until July 2009, when the assets of RRM were sold in receivership to Michael D'Ambra (D'Ambra).[5]  The plaintiff currently works for D'Ambra at Rhode Island Ready Mix, the successor company of RRM.

The plaintiff filed an action against Aiello on August 8, 2006.  The complaint alleged: (1) promissory estoppel; (2) breach of an oral contract; (3) breach of an implied contract;

---

[3] More pointedly, Aiello was like a father to plaintiff.  The plaintiff and Aiello often ate supper together and attended family gatherings.  The plaintiff even had Aiello serve as his best man at his wedding.

[4] RS&G was also purchased by Peter Calcagni at the same time.  Aiello offered Nero the opportunity to purchase RS&G prior to this sale; however, Nero declined the offer.

[5] Calcagni ultimately sued Aiello for issues that arose on the site of RRM, including misrepresenting financial statements.

(4) breach of a quasi-contract; and (5) constructive trust. On May 15, 2007, plaintiff filed an amended complaint, alleging the same claims against Mrs. Aiello. The amended complaint also alleged fraud and negligent misrepresentation against both defendants.

A bench trial before a justice of the Superior Court commenced on November 30, 2011. The trial spanned ten nonconsecutive trial days, concluding on January 6, 2012. At trial, plaintiff recounted the numerous assertions that Aiello made regarding his future plans for RRM. He testified that in 1996 he was told by Aiello that it would be a "great opportunity" for plaintiff to join the RRM team and that "at some time in the future [plaintiff] would possibly be able to purchase the company." The plaintiff recalled accepting the offer because "[i]t felt like [he] was coming back to [his] father's business to help him run it and to take it over at some point." He testified that, after he was appointed president, vice president, and CEO, Mrs. Aiello said, "Congratulations, it is your baby now." According to plaintiff, Aiello often declared that "when he was going to retire * * * he would come up with a fair market value of the business and at some point sell the business to [plaintiff]." Nonetheless, plaintiff acknowledged that he also knew that he was under no obligation to purchase RRM. The plaintiff also testified that statements concerning his future ownership of RRM were made in other contexts—recounting that a third party was directed to inquire with plaintiff about whether RRM was for sale[6] and that Aiello had counseled him to execute a prenuptial agreement in order to protect himself and RRM.

Nero corroborated plaintiff's testimony. He testified that, like plaintiff, he managed RS&G and was repeatedly told that he could purchase the company after Aiello retired. Nero also explained that the future plans for RS&G and RRM were openly discussed within the Aiello

_____

[6] When questioned about this dialogue, Aiello testified that he made these statements only in an attempt to dodge negotiations that he did not care to discuss.

- 4 -

family. At the end of his testimony, Nero claimed that he was "surprised" that Aiello sold RRM because he "always assumed that [plaintiff] would be with [RRM]." Aiello explicitly denied ever stating that plaintiff would have the option to purchase RRM in the future. Mrs. Aiello testified that plaintiff did not accrue any additional authority from his corporate titles. However, their credibility was assailed by the factfinder.

Based on Aiello's statements, plaintiff testified that he acted "like a company owner" and oversaw "the whole operation." He did not consider other employment opportunities and made numerous loans to RRM in hopes of someday owning the company. These loans totaled approximately $400,000 and were interest-free.[7] The plaintiff did acknowledge on cross-examination that all of the loans were repaid. Nero corroborated plaintiff's hard work, testifying that RRM grew in large part due to plaintiff's efforts.

D'Ambra testified that while he eventually revived RRM after the receivership, he and Aiello had previously negotiated a sale of RS&G and RRM in 2005. According to D'Ambra, Aiello did not believe that plaintiff had the ability to buy the company. After the negotiations with D'Ambra fell through, Calcagni purchased the sister companies.[8]

Calcagni testified that he believed Aiello owned both companies. He stated that he had no knowledge of Mrs. Aiello's ownership until she arrived at the closing to sign the requisite documents. Mrs. Aiello testified that her husband served as a consultant and that she was the sole owner of RRM. However, she acknowledged that the funds from the sale of RRM to Calcagni were commingled with her husband's proceeds from the simultaneous sale of RS&G,

---

[7] According to plaintiff, the Aiellos acquiesced in the loans and purchases, except for the acquisition of a generator. Mrs. Aiello contradicted this testimony, claiming that plaintiff was difficult to work with and often made purchases without authority to do so.

[8] Calcagni testified that he was predominantly interested in purchasing RS&G, but Aiello informed him that the companies were being sold as a package.

such that she was unable to quantify the net proceeds. Calcagni testified that the Aiellos took considerable efforts to conceal the sale from their employees. For instance, Calcagni stated that when he inspected the premises, he was not allowed to exit the vehicle. He also testified that the Aiellos crafted a misleading memorandum which stated that Calcagni was a new stockholder in the companies, indicating that Aiello was still involved in the companies. Although Calcagni testified that Aiello assured him that plaintiff would continue to manage RRM and would not take issue with the sale, he described a meeting he had with plaintiff because of his concerns that plaintiff was disgruntled. It was at this meeting that he learned that the $50,000 paid to plaintiff was not a bonus, but was repayment of a loan.

Both parties submitted posttrial memoranda; and, on July 22, 2013, the trial justice issued a comprehensive bench decision. The trial justice summarized the testimony and found that plaintiff, Nero, D'Ambra, and Calcagni were credible and honest witnesses. Based on their testimony, she found that "no later than 1999, [plaintiff] genuinely believed he would have the opportunity to buy the business when * * * Aiello retired and that * * * Aiello would help him structure a payment plan." She added that plaintiff was a double asset to the Aiellos—he was a hard worker, as well as "a potential buyer waiting in the wings until they were ready to sell."

The trial justice found neither defendant to be credible, noting that Aiello was evasive and nonresponsive, sometimes injecting petty, negative comments about other witnesses in an attempt to inject bias into the proceedings. The trial justice concluded that Aiello "disingenuously attempted to minimize his role" in RRM and that Mrs. Aiello assented to her husband's efforts through her silence and acquiescence. The trial justice was not persuaded that the Aiellos had difficulty working with plaintiff; rather, she was convinced that plaintiff was "encourage[d] * * * into thinking he should throw his heart, soul, and money into" RRM.

Before turning to the issue of liability, the trial justice characterized the Aiellos' conduct as "despicable and an egregious breach of personal trust." Nevertheless, the trial justice rejected all claims, save for plaintiff's claim of unjust enrichment. On the question of whether there was an implied contract, the trial justice found that in 1996 Aiello spoke in terms of future possibilities and an employment incentive, which she found was mere "puffing." She explained that plaintiff and Aiello did not discuss any essential terms of the agreement, and the subsequent conduct of the parties did not cure this fatal defect. Referring to the 1999 conversation in which Aiello declared that, when he retired, he would structure a payment plan for plaintiff to purchase the business, the trial justice concluded that this conversation injected even more uncertainty because the meaning of the term "retirement" was unclear; there was no discussion about a succession plan in the event that Aiello died before retiring; and there was no colloquy about financing or the potential purchase price. Because plaintiff testified that he did not consider himself bound to purchase the company, the trial justice concluded that there was no implied contract, as the essential elements of mutual assent and certainty of the essential terms were lacking.

The trial justice was unconvinced that plaintiff was ready, willing, and able to purchase RRM. She accepted the testimony of Ralph Shippee (Shippee), a moneylender, who testified to a brief conversation he had with plaintiff prior to June 2005 concerning potential financing for the purchase price of RRM. The trial justice concluded that Shippee would have offered financing to plaintiff, but plaintiff had failed to prove that he would have proceeded with the purchase upon reviewing the actual financing terms. Having carefully reviewed the testimony of the trial witnesses, the trial justice concluded that plaintiff's implied contract claim must fail.

The trial justice also rejected plaintiff's promissory estoppel claim, finding that Aiello's promises were not clear and unambiguous. The trial justice found that the term "retirement" was an indefinite term that created ambiguity. She found that Aiello's statements were "at best, discussions of possible future career developments and opportunities" and not promises. Second, the trial justice found no reasonable reliance on these statements by plaintiff because a competent businessman would not rely on "vague statements, love, and affection * * * even in the face of the Aiellos' continuous bolstering and lulling conduct." Finally, the trial justice found that there was no detrimental reliance because plaintiff was paid a considerable salary and gained managerial experience during his employment.

Next, the trial justice briefly addressed in tandem plaintiff's fraud and negligent misrepresentation claims. The trial justice noted the general rule that fraud claims cannot be predicated on promises of future action unless the promise is used as a device to accomplish a fraudulent scheme. The trial justice concluded that, on the basis of the evidence presented, the Aiellos did not intend to deceive plaintiff at the time the statements were made. Rather, the trial justice found that in 2005 the Aiellos, faced with financial difficulties, simply changed their minds about selling RRM to plaintiff. Nonetheless, the trial justice did find that the Aiellos deliberately concealed the true ownership of RRM.

Finally, the trial justice concluded that plaintiff established a claim for unjust enrichment because the Aiellos were well aware that plaintiff made interest-free loans to RRM on the expectation that RRM someday would belong to him. As a result, the trial justice held that plaintiff would be entitled to reasonable interest on those loans, but she noted that plaintiff failed to present any evidence on what interest rates should apply. She therefore declined to render an award.

Judgment was entered on July 29, 2013. The plaintiff filed a timely notice of appeal on August 16, 2013.

## Standard of Review

"It is well established that the factual findings of a trial justice sitting without a jury are accorded great weight and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." Wellington Condominium Association v. Wellington Cove Condominium Association, 68 A.3d 594, 599 (R.I. 2013) (quoting Hernandez v. JS Pallet Co., 41 A.3d 978, 982 (R.I. 2012)). "If, as we review the record, it becomes clear to us that 'the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for [that of the trial justice] even though a contrary conclusion could have been reached.'" Id. (quoting Hernandez, 41 A.3d at 982).

"A judgment in a nonjury case will be reversed on appeal when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong." Lamarque v. Centreville Savings Bank, 22 A.3d 1136, 1139-40 (R.I. 2011) (quoting Cathay Cathay, Inc. v. Vindalu, LLC, 962 A.2d 740, 745 (R.I. 2009)). "This Court consistently has held that factual findings of a trial justice sitting without a jury are granted an extremely deferential standard of review." State v. Gianquitti, 22 A.3d 1161, 1165 (R.I. 2011). "Pure questions of law, however, we review on a de novo basis." Lamarque, 22 A.3d at 1140 (citing Cathay Cathay, Inc., 962 A.2d at 745; Ondis v. City of Woonsocket ex rel. Treasurer Touzin, 934 A.2d 799, 802 (R.I. 2007)).

**Analysis**

**Implied Contract**

The plaintiff assigns error to the trial justice's finding that the evidence failed to establish an implied contract. He argues that the trial justice erroneously confined her analysis to the 1996 and 1999 conversations between plaintiff and Aiello and ignored the subsequent conduct of the parties. As a result, plaintiff contends, the trial justice overlooked material evidence. In addition, plaintiff posits that the trial justice's narrow view of the evidence limited her assessment of its probative value on the critical issue of whether the parties reached an agreement that gave plaintiff the right of first refusal to buy RRM.

An implied-in-fact contract "is a form of express contract wherein the elements of the contract are found in and determined from the relations of, and the communications between the parties, rather than from a single clearly expressed written document." Marshall Contractors, Inc. v. Brown University, 692 A.2d 665, 669 (R.I. 1997). "The difference between an express contract and an implied-in-fact contract is simply the manner by which the parties express their mutual assent." Id. Critically, to be enforceable, an implied-in-fact contract "must contain all [of] the elements of an express contract." Bailey v. West, 105 R.I. 61, 64, 249 A.2d 414, 416 (1969). We have held that the "essential elements of contracts 'implied in fact' are mutual agreement, and intent to promise, but the agreement and the promise have not been made in words and are implied from the facts." Id. at 64-65, 249 A.2d at 416. In determining whether these elements are present, we generally look to the "parties' conduct, actions, and correspondence." Marshall Contractors, Inc., 692 A.2d at 669.

Our careful review of the bench decision satisfies us that, contrary to plaintiff's contention, the trial justice's analysis was not confined to the 1996 and 1999 conversations. The

trial justice began by summarizing the testimony of the various witnesses, finding all witnesses—except defendants—to be honest and credible. Accepting the facts as true, it is clear to this Court that the trial justice did not overlook material evidence regarding the parties' subsequent conduct.[9] She noted the "frequent conversations, references, comments, and remarks confirming the future plan, that is, * * * when * * * Aiello retired [plaintiff] would buy [RRM] * * *." She also referenced plaintiff's testimony about an "ongoing and continuing series of comments, conversations, and remarks all of which were consistent with what had been stated to him in 1996 and 1999." The trial justice highlighted the 1996 and 1999 conversations because the record contains scant evidence of other concrete occurrences to serve as a starting point. Although the doctrine of an implied-in-fact contract allows for a wider evidentiary net to prove the formation of a contract, proof of the essential elements of a contract is nonetheless required. Compare Marshall Contractors, Inc., 692 A.2d at 669, with Filippi v. Filippi, 818 A.2d 608, 619 (R.I. 2003) (explaining that the parol-evidence rule limits contractual review of an integrated document to the document itself). The record before us demonstrates that there was an understanding between the parties that plaintiff would eventually own RRM. This understanding alone, however, was not sufficient to create an implied contract.

Turning to the 1996 conversation, the trial justice found that Aiello's offer was framed as a mere possibility of a future ownership opportunity, a tactic often used as a selling point. As plaintiff was a new hire in 1996, she was "not at all persuaded that either of the Aiellos would have gone so far to offer the business to [plaintiff] at that point or that [plaintiff] would have been reasonable in believing that this is what they were doing." Furthermore, there is no

---

[9] The trial justice did state that "[t]he theory of implied contract does not permit a Court to rely on subsequent conduct in order to attribute obligations that the parties did not have in mind in the first instance." However, this pronouncement was stated in the ambit of plaintiff's right of first refusal argument, discussed infra.

- 11 -

evidence that any terms of the sale were discussed by the parties in 1996.

The trial justice also examined the evidence surrounding the 1999 conversation and found that the discussion gave rise to more uncertainty. In summarizing this ambiguity, she concluded:

> "Importantly, the question of what would happen if * * * Aiello were to die before retiring was not addressed. Furthermore, 'retirement' was not defined. In other words, left open was the question of whether 'retirement' meant that * * * Aiello would stop working in the ordinary course of reaching the end of his natural work life versus his selling this particular business and moving on to some other employment situation or perhaps starting a new business. Was [plaintiff] entitled to purchase if the Aiellos simply decided to sell this particular business as opposed to retiring?"

The trial justice also recognized gaps in basic contract terms, including the payment structure, financing, and purchase price. She concluded that the decision to sell RRM to plaintiff rested solely with the Aiellos based on the lack of specificity surrounding those discussions.

This Court has declined to find mutual assent on essential terms when "the promises of the parties depend on the occurrence of some future event within the unilateral control of the promisors * * *." Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1341 (R.I. 1996). The trial justice also emphasized that plaintiff did not consider himself bound to an agreement to purchase and that he could negotiate or decline to go forward were an offer to purchase presented to him. See Smith v. Boyd, 553 A.2d 131, 133 (R.I. 1989) ("[A]lthough it is objective intent that controls in contract formation, subjective intent may be one of the factors which comprises objective intent. There are instances in which a party intends that his agreement to terms of a contract will have no legal consequences. In this situation, there is no intent to be bound.").

Before this Court, plaintiff argues that the parties' conduct formed an agreement which gave plaintiff a right of first refusal to purchase RRM. Although we agree with the trial justice that this interpretation would eliminate some of the lingering questions that confronted her, we

agree that she correctly rejected this argument. An implied contract granting plaintiff the right of first refusal is simply not supported by the evidence nor was the claim raised in plaintiff's first amended complaint. Significantly, paragraph 62 of the first amended complaint alleges that "[t]he actions of Aiello and [plaintiff] exhibited mutual agreement and intent to sell RRM to [p]laintiff, thus there was established <u>a contract for the sale of the business implied in fact</u>." (Emphasis added.) The plaintiff's first amended complaint is silent as to any suggestion that defendants gave plaintiff the right of first refusal to purchase RRM. This argument explicitly was rejected by the trial justice, based on the evidence and testimony that was before the court. We see no error.

This Court previously has acknowledged that "the resolution of a dispute concerning if and when contract negotiations materialize into a mutual understanding and result[] [in a] binding contract is ordinarily a question of fact for the factfinder." <u>Marshall Contractors, Inc.</u>, 692 A.2d at 670. Having vetted the voluminous trial transcripts, we fail to glean any evidence indicating that the parties agreed on essential terms of a purchase agreement as to establish an implied contract for the purchase of RRM.[10] <u>See Opella v. Opella</u>, 896 A.2d 714, 720 (R.I. 2006) ("For either an express or implied contract, 'a litigant must prove mutual assent or a meeting of the minds between the parties.'" (quoting <u>Mills v. Rhode Island Hospital</u>, 828 A.2d 526, 528 (R.I. 2003) (mem.))). Accordingly, we are satisfied that the trial justice did not err in concluding that plaintiff failed to establish the existence of an implied contract.

---

[10] Since we affirm the trial justice's finding that plaintiff failed to prove the existence of an implied contract, we find it unnecessary to discuss whether plaintiff was ready, willing, and able to enter into such contract had there been one.

**Promissory Estoppel**

The plaintiff makes a similar argument concerning his claim of promissory estoppel: that the trial justice overlooked material evidence by confining her analysis to the 1996 and 1999 conversations. The plaintiff also contends that the trial justice erroneously concluded that plaintiff did not reasonably rely on Aiello's promises to his detriment. We do not agree.

Promissory estoppel generally is invoked when, for one reason or another, an agreement between two parties fails on an essential element of a contractual claim. Alix v. Alix, 497 A.2d 18, 21 (R.I. 1985). In adopting the Restatement (Second) Contracts approach to the doctrine, this Court has defined promissory estoppel as: "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance, [and therefore] is binding if injustice can be avoided only by enforcement of the promise." Filippi, 818 A.2d at 625 (quoting Alix, 497 A.2d at 21). Application of the doctrine of promissory estoppel also has been extended "to situations in which the promisee's reliance on the promise was induced, and injustice may be avoided only by enforcement of the promise." Id. (citing Alix, 497 A.2d at 21). In Filippi, this Court articulated a three-element approach to promissory estoppel:

> "1. A clear and unambiguous promise;
>
> "2. Reasonable and justifiable reliance upon the promise; and
>
> "3. Detriment to the promisee, caused by his or her reliance on the promise." Id. at 626.

In addressing plaintiff's promissory estoppel claim, the trial justice found that the claim failed on each element. First, the trial justice found that Aiello did not make a clear and unambiguous promise that plaintiff could purchase the business. Specifically, the trial justice found that Aiello's statements were "too indefinite to constitute a specific term for purposes of

- 14 -

promissory estoppel." As discussed, the evidence before the trial justice demonstrated that Aiello's statements concerned future opportunities for employment or the possibility of buying the business, but lacked any certainty and specificity. The trial justice did not overlook material evidence in determining that these statements were likewise too unclear and ambiguous to support a claim of promissory estoppel.

Although Aiello often indicated that plaintiff would someday own RRM, the frequency of these remarks does not cure their ambiguity. At most, Aiello's redundancy created a promise to discuss the purchase of RRM with plaintiff at some point in the future. "Promissory estoppel cannot be based upon preliminary negotiations and discussions or on an agreement to negotiate the terms of a contract." B.M.L. Corp. v. Greater Providence Deposit Corp., 495 A.2d 675, 677 (R.I. 1985). Because a finding of promissory estoppel can transpose an otherwise gratuitous promise into an enforceable agreement, Hayes v. Plantations Steel Co., 438 A.2d 1091, 1096 (R.I. 1982), this Court is reluctant to expand the doctrine to a promise that is uncertain or indefinite merely because the promise was reiterated on numerous occasions. Because the doctrine of promissory estoppel is aimed at enforcing clear and unambiguous commitments in order to avoid injustice, a strict adherence to the elements of promissory estoppel is required.

Even if Aiello's statements were found to be sufficiently clear and unambiguous promises, plaintiff still bore the burden of proving the remaining elements of promissory estoppel, including detrimental reliance. The trial justice found that it was not reasonable for plaintiff to rely on Aiello's statements. She held that a "competent businessman" would not reasonably rely on "vague statements, love, and affection" when "the business world is built on written agreements." We note that approximately nine years elapsed from plaintiff's return to work at RRM and the time when Aiello sold the business to Calcagni. During that time, with the

exception of the brief eleventh-hour discussion with the moneylender, there is no evidence that plaintiff consulted with an attorney or accountant or initiated or engaged in any discussions with Aiello about buying the company. Futhermore, Aiello's future plans for RRM were never reduced to writing. The trial justice also found that plaintiff benefited from his position at RRM—gaining considerable experience and earning an acceptable salary—thus defeating the element of detrimental reliance. We are therefore satisfied that the trial justice correctly concluded that plaintiff did not reasonably rely on Aiello's statements to his detriment.

### Fraud and Negligent Misrepresentation

The plaintiff argues that the trial justice erred in dismissing his fraud and negligent misrepresentation claims. Specifically, he contends that the trial justice "found that both of the Aiellos were dishonest not only in their testimony, but also in their dealings with [plaintiff]." As a result, plaintiff maintains that the trial justice erroneously concluded that the Aiellos simply changed their minds when they decided to sell RRM to someone other than plaintiff. The defendants posit that the trial justice's credibility findings do not meet the legal requirements of a fraud or negligent misrepresentation claim.

"To establish a prima facie fraud claim, 'the plaintiff must prove that the defendant made a false representation intending thereby to induce [the] plaintiff to rely thereon and that the plaintiff justifiably relied thereon to his or her damage.'" McNulty v. Chip, 116 A.3d 173, 182-83 (R.I. 2015) (quoting Parker v. Byrne, 996 A.2d 627, 634 (R.I. 2010)). However, "the general rule is that mere unfulfilled promises to do a particular thing in the future do not constitute fraud in and of themselves."[11] 37 Am. Jur. 2d Fraud and Deceit § 87 at 122 (2013). This precept was

---

[11] 37 Am. Jur. 2d Fraud and Deceit § 87 at 122-23 (2013) ("Reasons given for the rule not permitting predication of fraud on promises that are merely unkept subsequently are that a mere promise to perform an act in the future is not, in a legal sense, a representation or statement of

- 16 -

not overlooked by the trial justice, who found that Aiello's statements regarding RRM always revolved around the <u>future</u> disposition of the company, and therefore could not form the basis for a claim of fraud.

These principles apply with equal force to plaintiff's negligent misrepresentation claim. "To establish a <u>prima</u> <u>facie</u> case of negligent misrepresentation, the plaintiff [must prove, <u>inter</u> <u>alia</u>,]: 'a misrepresentation of a material <u>fact</u>.'" <u>Zarrella v. Minnesota Mutual Life Insurance Co.</u>, 824 A.2d 1249, 1257 (R.I. 2003) (emphasis added) (quoting <u>Mallette v. Children's Friend and Service</u>, 661 A.2d 67, 69 (R.I. 1995)). Future events or promises are not considered factual. <u>See</u> 37 C.J.S. <u>Fraud</u> § 76 at 263-64 (2008) ("[T]o give rise to a liability for negligent misrepresentation, an alleged misrepresentation must be factual and not promissory or related to future events."); <u>see also</u> 37 Am. Jur. 2d <u>Fraud and Deceit</u> § 128, at 167-68 ("'Negligent misrepresentation' * * * differs from fraudulent misrepresentation only in that while the latter requires knowledge that the pertinent statement was false, the former merely requires that the person who made the statement failed to exercise reasonable care or competence to obtain or communicate true information."). The record is devoid of any evidence that indicates that Aiello's statements were "made without any intention of performing [them] at the time of making [them]." 37 Am. Jur. 2d <u>Fraud and Deceit</u> § 91 at 126. In fact, the trial justice concluded that the Aiellos "genuinely wanted to groom [plaintiff] as a candidate for buying them out." The plaintiff has failed to set forth any evidence which indicates that Aiello acted with scienter or knew that his representations were false when made. Cf. <u>Cheetham v. Ferreira</u>, 73 R.I. 425, 429,

---

existing or past fact, and a person has no right to rely on such a promise or statement. A mere failure to perform a promise does not change its character. Moreover, a representation that something will be done in the future, or a promise to do it, cannot, from its nature, be true or false at the time when it is made. The failure to make it good is merely a breach of contract, which must be remedied by an action on the contract, if at all.").

56 A.2d 861, 863 (1948) ("[A] seller's expression of mere matters of opinion or judgment, especially as to possible future profits, comes within the category of 'dealers' talk' or 'puffing.' However, where the representation amounts to the positive assertion of an existing material fact * * * it transcends the limits of 'puffing.'"). Accordingly, plaintiff's fraud and negligent misrepresentation claims must fail for lack of proof as well.

### Unjust Enrichment

In his final argument, plaintiff contends that, after finding that plaintiff established a claim of unjust enrichment, the trial justice erred by limiting damages to reasonable interest and then dismissing the count for failure to prove those damages. The defendant responds that this argument has been waived and, alternatively, that plaintiff failed to present any proof of the damages to which plaintiff claims he is entitled—evidence that links the profitability of RRM, as well as its eventual sale, to plaintiff's loans to the company.

As a threshold matter, we are not persuaded that plaintiff waived his argument on the appropriate measure of damages on his unjust enrichment claim. This Court has long adhered to the "raise or waive" rule: "an issue that has not been raised and articulated previously at trial is not properly preserved for appellate review." State v. Gomez, 848 A.2d 221, 237 (R.I. 2004) (quoting State v. Donato, 592 A.2d 140, 141 (R.I. 1991)). The defendant urges this Court to apply the "raise-or-waive" rule because plaintiff argued in his posttrial memorandum that he should be entitled to interest on the loans he made to RRM. Here, plaintiff requested interest and reimbursement as damages "at the very least" and pointed to RRM's growth and profitability as evidence that "[h]e conferred an objectively definable benefit upon the Aiellos by allowing RRM to grow and become profitable, undoubtedly increasing its attractiveness to prospective

purchasers." For these reasons, we are satisfied that plaintiff's argument on this issue has not been waived.

"It is well established that '[r]ecovery for unjust enrichment is predicated upon the equitable principle that one shall not be permitted to enrich himself at the expense of another by receiving property or benefits without making compensation for them.'" South County Post & Beam, Inc. v. McMahon, 116 A.3d 204, 213 (R.I. 2015) (quoting Emond Plumbing & Heating, Inc. v. BankNewport, 105 A.3d 85, 90 (R.I. 2014)). "Under Rhode Island law, unjust enrichment is not simply a remedy in contract and tort but can stand alone as a cause of action in its own right." Dellagrotta v. Dellagrotta, 873 A.2d 101, 113 (R.I. 2005) (citing Toupin v. Laverdiere, 729 A.2d 1286 (R.I. 1999)). To recover on an unjust enrichment claim, a plaintiff must prove: "(1) that he or she conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances 'that it would be inequitable for [the recipient] to retain the benefit without paying the value thereof.'" Id. (quoting Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997)). As a result, "unjust enrichment focuses on the propriety of a payee or beneficiary retaining funds or a benefit * * *." Process Engineers & Constructors, Inc. v. DiGregorio, Inc., 93 A.3d 1047, 1052 (R.I. 2014) (quoting Parnoff v. Yuille, 57 A.3d 349, 355 n.7 (Conn. App. Ct. 2012)). The parties have not directed our attention to, nor have we uncovered, any case law that articulates a hard and fast rule for the measure of damages on an unjust enrichment claim arising out of interest-free loans. As a result, we are of the opinion that plaintiff's damages were not necessarily limited to a reasonable rate of interest.

We are satisfied, however, that the trial justice did not err in limiting plaintiff's damages to interest in the context of this case. According to the Restatement (Third) Restitution and

Unjust Enrichment § 49(2) at 176 (2011), "[e]nrichment from a money payment is measured by the amount of the payment or the resulting increase in the defendant's net assets, whichever is less." Because the loans were repaid in full, the trial justice's analysis could have concluded. Supplemental enrichment, usually a form of disgorgement, may be appropriate under certain circumstances—namely, when an individual receives a benefit due to conscious wrongdoing. See id. at §§ 51, 53. The trial justice was unable to conclude that the Aiellos engaged in any deceit or legal wrongdoing, finding instead that defendants simply changed their minds about selling the business to plaintiff. Based on the customary form of compensation for a loan—a reasonable rate of interest on the amount of the loan—the trial justice determined that interest was an appropriate measure of damages. A moneylender generally is not compensated for the positive benefits derived by the loan, such as increased profitability, unless the agreement provides for some sort of royalty. Unjust enrichment is not aimed at placing the benefit conferring party in a better position than had there been a contract or compensation in the first place.

Finally, and significantly, even the most generous reading of the record discloses a vague and attenuated evidentiary connection between the plaintiff's loans and the growth and profitability of RRM. The plaintiff did testify that he made loans to the company in order to enhance RRM's business and that some loans were provided to allow RRM to undertake certain projects. Nonetheless, the record is devoid of any evidence which correlates the plaintiff's loans to RRM's pecuniary triumphs. See Restatement (Third) Restitution and Unjust Enrichment § 51, cmt. f. at 212 ("[A]n objection that profits are 'remote' may mean simply that they are impossible to measure with sufficient accuracy; or that they are the product of legitimate contributions by the defendant that should not, in justice, be awarded to the claimant * * * .").

Thus, we are of the opinion that the trial justice did not inappropriately limit the plaintiff's damages on his unjust enrichment claim to reasonable interest, which was not proven at trial.[12]

## Conclusion

For the reasons set forth herein, we affirm the judgment in the case.[13] The papers in this case are remanded to the Superior Court.

---

[12] Although the trial justice, in a nonjury trial, was vested with discretion to reopen the evidence and take proof on the relevant interest rate, she declined to do so. See State v. DiPetrillo, 922 A.2d 124, 136 (R.I. 2007) ("In a jury-waived trial, a trial justice is vested with broad discretion to hear evidence, pass on the merits of a claim, reopen the proceeding or make additional findings of fact based on the state of the record." (emphasis added) (citing Connecticut Valley Homes of East Lyme, Inc. v. Bardsley, 867 A.2d 788, 795 (R.I. 2005))). Extensive resources were expended in this case—five years passed before the case proceeded to trial; the trial spanned ten days; and another year and a half elapsed before the trial justice rendered her decision. The plaintiff failed to present any evidence of a reasonable rate of interest during trial or move to reopen the proceedings in order to present such evidence. Furthermore, before this Court, plaintiff seeks a broader measure of damages on the unjust enrichment claim—as opposed to a remand to fasten the actual measure of damages awarded. It is apparent that a reasonable rate of interest fell by the wayside on multiple occasions during this saga.

[13] In light of our holding affirming the dismissal of plaintiff's implied contract, promissory estoppel, fraud, and negligent misrepresentation claims, we need not address the trial justice's advisory findings on damages as plaintiff is not entitled to damages on these claims.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     Mathew M. Cote v. John Aiello et al.

**CASE NO:**     No. 2013-311-Appeal.
(PC 06-4136)

**COURT:**     Supreme Court

**DATE OPINION FILED:**  November 2, 2016

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**     Providence County Superior Court

**JUDGE FROM LOWER COURT**:

     Associate Justice Patricia A. Hurst

**ATTORNEYS ON APPEAL:**

     For Plaintiff:  Melissa Bucaria, Esq.

     For Defendants:  Lauren E. Jones, Esq.
                      Robert S. Thurston, Esq.
                      Richard A. Boren, Esq.