November 26, 2019

**Supreme Court**

No. 2018-261-Appeal.
(WC 08-107)

E.W. Burman, Inc.　　　　　　　:

v.　　　　　　　　　:

Bradford Dyeing Association, Inc.　　　:

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

E.W. Burman, Inc.                    :

            v.                       :

Bradford Dyeing Association, Inc.    :

Present:  Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  The plaintiff, E.W. Burman, Inc. (E.W. Burman or plaintiff), appeals from a Superior Court judgment entered in favor of the defendant, Bradford Dyeing Association, Inc. (Bradford Dyeing or defendant), following a bench trial in which the trial justice concluded that no oral or implied-in-fact contract existed between the parties.  The trial justice also found that the defendant was not liable under the theories of quasi-contract or promissory estoppel.  This case came before the Supreme Court on November 6, 2019, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After carefully considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

In May 2007, a fire occurred at Bradford Dyeing's facility in Westerly that caused significant structural damage.  The defendant enlisted the help of Commonwealth Engineers

- 1 -

(Commonwealth) to assist in the restoration of its facilities. The restoration project consisted of two phases: Phase one required the installation of a temporary roof that would permit operations to continue, and phase two required the complete replacement of the roof. Phase two is the basis for this action. Liberty Mutual Insurance Company (Liberty Mutual) insured defendant, contributed to the cost for the phase one repairs, and was expected to also contribute to phase two repairs. Liberty Mutual was therefore involved in communication with Commonwealth and defendant regarding the roof reconstruction designs for phase two. Commonwealth designed the new roof and promptly issued requests for bids. At the close of the bid deadline, plaintiff was the lowest bidder by approximately $400,000.

On August 27,[1] a meeting was held between plaintiff's president, Edward W. Burman, Jr. (Burman), two individuals from Commonwealth, and Charles Doherty from Liberty Mutual. Liberty Mutual had engaged the private engineering firm of Simpson, Gumpertz & Heger to verify the phase two designs and to determine whether plaintiff understood the scope of the roof project. A representative from that firm was also in attendance at that meeting. What occurred at that meeting is disputed, but, nevertheless, contract negotiations ensued shortly after. While negotiations continued, plaintiff incurred costs for drawings and materials for the roof restoration project. Ultimately, before any written contract had been signed, defendant decided to change its roof plans.

The plaintiff sent defendant an invoice for materials purchased based on the original roof design, and it sent a revised bid to Commonwealth with respect to the new roof design. In response, defendant, through its attorney, sent plaintiff a letter claiming that plaintiff was never authorized to purchase materials for the project. Subsequently, plaintiff filed a complaint against

---

[1] All events in this case, unless otherwise designated, took place in 2007.

defendant in Washington County Superior Court alleging (1) breach of contract, (2) breach of implied contract, and (3) that defendant was liable under the theory of quasi-contract. The plaintiff in 2011 filed an amended complaint that added the allegation that defendant was liable under the theory of promissory estoppel.

A bench trial before a justice of the Superior Court commenced on January 23, 2012. The trial lasted four days and concluded on January 26, 2012. Three witnesses testified: Burman; Commonwealth's corporate secretary and treasurer, Steven M. Clarke (Clarke); and Attorney Gerald Petros (Petros), who had been defendant's outside legal counsel. Burman was the first witness to testify, and he recounted that plaintiff submitted a bid on the roof restoration project on August 17. On August 20, Bruce Bartel, Commonwealth's project engineer for this project, contacted Burman and informed him that E.W. Burman was the low bidder. Burman testified that Bartel asked how soon they could start, and Burman told him they could start immediately. Burman testified that Bartel called him later in the week and said "that, again it looks like it's a go project for us," and that the final hurdle was meeting with Liberty Mutual because it would be paying for the project and wanted to know if plaintiff completely understood the scope of the work.

Burman testified that the scope meeting occurred on August 27. Present were Burman, Bartel and Clarke from Commonwealth, Charles Doherty from Liberty Mutual, and a representative from Liberty Mutual's engineering firm. Burman testified that no employee or representative of defendant was present at the meeting. Burman testified that Bartel and Clarke told him at the meeting that plaintiff was the contractor on the project and that plaintiff and defendant "had an oral contract after [they] came out of that meeting." He testified that he, Bartel, and Clarke discussed what form of contract they would use, and Burman offered to

"expedite things" and send over a form contract for review, which Burman did the same day. Burman testified that he submitted a final proposed schedule of construction and that neither Commonwealth nor Liberty Mutual objected to the schedule.

Burman testified that, based on the schedule he submitted and because "[t]ime was of the essence," he, on behalf of plaintiff, authorized Reliable Truss and Components, Inc. to begin preparing shop drawings for the roof trusses and ordered $63,000 worth of stainless-steel angles and flat bars from Shawmut Metal (Shawmut), despite not having signed a written contract for the project. He testified that Commonwealth had agreed that the work had to start immediately in order to meet the end date of December 31 and that he was "never told [at] any time at that 27th meeting not to proceed with any of the work. It was full steam ahead." Burman testified that his company commences work prior to having a written contract "all the time."

Burman further testified that E.W. Burman's project manager, Rich Hawes, sent an e-mail to Bartel on September 13 asking permission to visit the job site to take measurements. Burman testified that Bartel replied, including Burman and Clarke on the response, stating: "We have been directed by Bradford's attorney to wait on any visits or other work activities until contract issues are worked out with the insurance company. So, wait on any site visits until there is a contractual relationship between Burman and Bradford Dye." Burman testified that he interpreted Bartel's e-mail to mean that something was going on between defendant and Liberty Mutual, but that he did not know what the issue was.

Burman testified that he responded to Bartel's e-mail by telling him that no representative from plaintiff would visit the worksite. Burman further testified that, on September 17, he e-mailed Bartel asking if there had been "any movement on the legal end[,]" and emphasizing that plaintiff needed to get to the worksite to take measurements in order to comply with the

- 4 -

construction schedule. He testified that Bartel responded: "As there is no signed contract, all work done to date and until a contract is signed, is at your own risk." Burman testified that he was confused by the e-mail and called Clarke, Bartel's "boss," who assured Burman that there was no problem with plaintiff's contract and the issue was between defendant and Liberty Mutual. Burman testified that Clarke told him that, once that was resolved, they could get back to the job site.

Burman testified that, in September, Clarke had e-mailed him regarding the proposed written contract between plaintiff and defendant. He testified that Clarke informed him that "representatives from Liberty Mutual and Bradford Dye have reviewed the contract and have made some changes[,]" and that if Burman found them acceptable, he should execute four copies and bring them to Clarke's office. Burman testified that he responded to Clarke with several questions regarding changes that had been made to the contract. He testified that a damages clause had been included, meaning that E.W. Burman would have to pay the owner damages in the event that the work was not completed on schedule. Burman testified that he responded to Clarke immediately with a counterproposal asking for an incentive payment if plaintiff completed the project early. He testified that Clarke did not reply until October 24, when he responded with "a whole new document[.]" Burman testified that, during that time period, E.W. Burman was "on hold[,]" which "completely threw that [construction] schedule off."

Burman additionally testified that plaintiff was eventually cleared to visit the job site and take measurements, which occurred on October 25. Burman testified that, on October 29, plaintiff authorized Shawmut to start cutting materials for the project and signed a purchase order with Tri-State Fasteners, Inc. to supply all the bolts, nuts, washers, and screws for the project. Burman testified that, on November 5, the parties had reached agreement on all terms in the

contract, except for a possible price change for demolition work that Bradford Dyeing had performed itself while negotiations had stalled. Burman testified that the demolition issue was never resolved.

Burman testified, however, that on November 12, he received an e-mail from Clarke indicating that defendant was changing the plans for the new roof. Burman testified that he received the revised plans from Commonwealth and spoke with Clarke about the materials that had already been purchased by plaintiff. He testified that Clarke told him to incorporate as many of the purchased materials as he could into the revised project price.

Burman testified that he sent defendant an invoice on November 30 for the purchased materials and subsequently sent defendant a bid for the new project on December 10. Burman testified that he was anxiously waiting to hear something from defendant, but heard nothing through the end of December regarding the invoice or the new scope of work. Burman testified that he eventually called Craig Nichols, head of manufacturing operations for Bradford Dyeing, who told Burman that they were undecided about the new scope of work for the revised project. Burman testified that, when he asked about the invoice, Nichols basically told him "we didn't have any contract, we don't owe you any money[.]"

On cross-examination, Burman conceded that he wanted to eventually have a written contract and that there was a mutual expectation between plaintiff and defendant that there would be one. He further conceded that he and defendant exchanged different versions of written contracts between August and November and that obtaining a written contract remained a goal of his up until November 7. Burman testified that, in the majority of cases, his firm does not engage in fieldwork prior to having a written contract and that the majority of construction projects entail one. Burman conceded that he was familiar with the written document called an

"Official Notice to Proceed," which is generally given from an owner to a contractor indicating that the contractor can proceed with a project whether or not there is a written contract between the parties and that he did not have such a notice in this case. Burman testified that he placed orders for parts with three different companies, but he never specifically received permission from defendant to order those parts. He further conceded that he ordered those parts to ensure that they would be on the job site when he needed them, but that he did not perform other tasks that did not involve placing orders, despite claiming that "time was of the essence[.]"

Next, Clarke testified and recounted a contrary version of events. Clarke testified that he did not attend the scope meeting on August 27, but that Bartel did. Clarke testified that he never authorized plaintiff to order materials, but that he never prohibited plaintiff from doing so either. He testified that, when the project stalled in September, Commonwealth made it clear to Burman that he should not take field measurements or order any materials. Clarke testified that Bartel's September 17 e-mail to Burman meant that "all work done to date" was at E.W. Burman's own risk and "materials would be included in part of that." Clarke testified that he did not tell Burman, during their October 23 phone call, that the project was "a go."

Clarke testified that he never had authority to bind Bradford Dyeing to a contract, was never given authority by defendant to bind the company into a contract with plaintiff, and never indicated to any representative of plaintiff that plaintiff had a contract with defendant. He further testified that he never participated substantively in any contract discussions between plaintiff and defendant and only acted as a "facilitator" who "sent [the contract] up to the owner and legal entities." Clarke testified that he never received a phone call from Burman on September 17. He testified that he did speak with Burman on October 23 to inform him that the issues between

defendant and Liberty Mutual had been worked out and mentioned that the contract would be forthcoming.

The last witness to testify was Petros, who corroborated Clarke's testimony. Petros testified that he was "quarterbacking" the reconstruction process on defendant's behalf, and that he communicated with plaintiff through Commonwealth—specifically, Clarke. He further testified that he had no knowledge of the August 27 scope meeting with plaintiff, Liberty Mutual, and Commonwealth, but he knew that no contract would be signed or awarded that day. Petros additionally testified that a contract was in fact never signed with E.W. Burman, he never had any discussions with Burman, and he did not recall sending any communication to E.W. Burman.

Petros testified that he was aware that a written contract had been passed back and forth between plaintiff and defendant, but that defendant's discussions with Liberty Mutual did not progress fast enough to conclude negotiations with plaintiff. He testified that, at a certain point during negotiations, he held onto the contract and conveyed to plaintiff, through Commonwealth, that defendant was having discussions with Liberty Mutual during that time. Petros further testified that defendant needed to finish the contract before giving plaintiff the "green light" on the project, and denied that he gave Clarke permission to authorize Burman to proceed. He testified that defendant intended to have a written contract with plaintiff and that the parties worked towards one, but mutually agreeable terms were never reached.

Both parties submitted posttrial memoranda; and, on June 21, 2018, the trial justice issued a comprehensive written decision.[2] The trial justice found that the parties were actively engaged in negotiations regarding the terms of the contract as late as November 6 and that, at or about that time, defendant and Liberty Mutual reached agreement on the amount of insurance coverage for the fire loss. She further found that, based on the amount of financial contribution from Liberty Mutual, defendant selected a different roof design, which was simpler and more cost-effective, and thereafter notified plaintiff of that change. The trial justice found that, instead of asserting that it had an oral contract at that time, plaintiff submitted a new bid for the revised project, and plaintiff asserted that the parties had an enforceable oral agreement only after plaintiff found out that it was not the low bidder on the revised project.

The trial justice summarized the testimony and found both witnesses for defendant to be credible. The trial justice stated that Clarke's testimony was "straightforward and worthy of belief[,]" while Petros "presented as a credible witness" who provided "no reason to doubt the veracity of his testimony." Based on their testimony, the trial justice found that Clarke never expressly authorized plaintiff to purchase materials for the project and that Burman was expressly told not to send his employees to the job site. The trial justice further found that Clarke was "steadfast in his testimony that he was never authorized to bind [d]efendant to an agreement with [p]laintiff, and that it was never his intent to enter into an agreement on [d]efendant's behalf." The trial justice explained that Clarke served as an intermediary between the parties and that he forwarded each version of the proposed written contract to plaintiff for execution, but that the draft contract was rejected and counteroffers were made. She further

---

[2] The trial justice filed her written decision approximately six years after the parties filed their posttrial memoranda. We have not been apprised of an adequate explanation for the long and unreasonable delay in this case. Such a delay is not only concerning, but is also discouraged, as every effort should be made to decide cases as expeditiously and efficiently as possible.

found that defendant informed plaintiff about the changes to the roof design as soon as defendant and Liberty Mutual came to terms about the extent of insurance coverage for the repairs; however, until terms were reached, defendant felt it was unwise to cancel the existing plan it had been negotiating with plaintiff.

To the contrary, the trial justice found Burman's testimony to be "self-serving and lacking in credibility." She recalled that Burman testified that he believed Bartel's September 13 e-mail to be an error and that the contractual relationship referenced in the second paragraph was supposed to be the one between defendant and Liberty Mutual. The trial justice found Burman's belief to be unreasonable, especially because plaintiff's own contract negotiations with defendant had stalled. The trial justice further found that Burman was well aware that plaintiff had no signed contract with defendant in September, which rendered Bartel's September 17 directive "all that more clear: 'all work done to date and *until a contract is signed*, is at your own risk.'" (Emphasis added by trial justice.) The trial justice stated that it was disingenuous for Burman to assert that the parties were bound by an oral agreement formed at the August 27 scope meeting, at which defendant was not present, despite the "significant efforts in negotiating the construction contract with the [d]efendant through early November[.]"

On the question of whether an oral contract existed, the trial justice found that it was "abundantly clear that [d]efendant, the party sought to be charged, at all times intended that a written agreement be executed between the parties." The trial justice also explained that, based on Burman's own actions, plaintiff also intended to be bound by a written agreement. The trial justice recounted the continued negotiations between the parties and noted various offers and counteroffers—specifically plaintiff's objection to the insertion of a liquidated-damages clause and plaintiff's counteroffer to accept the liquidated-damages clause if matched by an incentive

payment clause. Importantly, she noted that defendant did not respond to or indicate approval of those changes.

Further, the trial justice reviewed Burman's claim that, on October 23, Clarke informed him that the project was "ready to go[,]" and "that this statement somehow meant that he no longer needed to concern himself" with the ongoing contract negotiations. The trial justice found this assertion not credible, especially given that Clarke sent Burman "an entirely new version of the form contract" on October 24. She explained that Burman responded to that new version with changes, specifically a certificate-of-occupancy issue, removal of a provision making plaintiff liable for snow removal, reimbursement for temporary heating on site, and plaintiff's desire to halve the excess-liability insurance requirement from $10 million to $5 million and reduce its deductible in case of loss from $20,000 to $1,000.

The trial justice also considered the particular industry, noting that Burman testified that large construction projects sometimes proceed without a written contract, but also that not all organizations he had worked with allow construction to proceed without a written contract in place. The trial justice found that defendant clearly seemed opposed to permitting plaintiff to begin construction without a written contract in place. The trial justice described that no past practices existed between these parties that would justify proceeding without a signed contract.

The trial justice ultimately found that defendant at all times anticipated its relationship with plaintiff to be governed by a written contract, defendant made it abundantly clear that plaintiff was not to perform any work without a written contract in place, and plaintiff "chose to ignore that directive and did so at its own peril." The trial justice concluded that no oral or implied-in-fact contract existed between the parties. She further concluded that defendant was

not liable under the theories of quasi-contract or promissory estoppel. A judgment in favor of defendant on all counts was entered on July 19, 2018, and plaintiff timely appealed.[3]

## II

### Standard of Review

"It is well established that the factual findings of a trial justice sitting without a jury are accorded great weight and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." *Kilmartin v. Barbuto*, 158 A.3d 735, 746-47 (R.I. 2017) (quoting *Cote v. Aiello*, 148 A.3d 537, 544 (R.I. 2016)). "If, as we review the record, it becomes clear to us that the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for that of the trial justice even though a contrary conclusion could have been reached." *Cote*, 148 A.3d at 544 (brackets omitted) (quoting *Wellington Condominium Association v. Wellington Cove Condominium Association*, 68 A.3d 594, 599 (R.I. 2013)). "Furthermore, the trial justice may 'draw inferences from the testimony of witnesses, and such inferences, if reasonable, are entitled on review to the same weight as other factual determinations.'" *Butterfly Realty v. James Romanella & Sons, Inc.*, 93 A.3d 1022, 1029-30 (R.I. 2014) (quoting *Cahill v. Morrow*, 11 A.3d 82, 86 (R.I. 2011)).

---

[3] On appeal, plaintiff's main contention is that the trial justice erred in finding that the parties did not enter into an oral contract. However, in a footnote, plaintiff makes the bare assertion that this Court should find for plaintiff on its promissory estoppel claim. The plaintiff cites no law and no claim of error regarding promissory estoppel in its 12A statement and admitted as much during oral argument. "This Court has held that 'simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue.'" *Giddings v. Arpin*, 160 A.3d 314, 316 (R.I. 2017) (mem.) (quoting *Giammarco v. Giammarco*, 151 A.3d 1220, 1222 (R.I. 2017)). Therefore, plaintiff's promissory estoppel claim is waived.

"A judgment in a nonjury case will be reversed on appeal when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong." *Cote*, 148 A.3d at 544 (quoting *Lamarque v. Centreville Savings Bank*, 22 A.3d 1136, 1139-40 (R.I. 2011)). "We review *de novo* questions of law and statutory interpretation." *Barbuto*, 158 A.3d at 747 (quoting *Cote*, 148 A.3d at 544).

## III

### Discussion

Before this Court, plaintiff contends that the trial justice misconceived and overlooked material evidence, made factual findings that were clearly wrong, and misapplied the law when finding that no oral contract existed between the parties. The plaintiff claims the trial justice committed multiple errors. We address each of these contentions below.

This Court has stated that "[f]or parties to form an enforceable contract, there must be an offer and an acceptance. Each party must have and manifest an objective intent to be bound by the agreement." *Opella v. Opella*, 896 A.2d 714, 720 (R.I. 2006). "For either an express or implied contract, 'a litigant must prove mutual assent or a meeting of the minds between the parties.'" *Id.* (quoting *Mills v. Rhode Island Hospital*, 828 A.2d 526, 528 (R.I. 2003) (mem.)). "It is a party's objective intent that will be considered as creating either an offer or acceptance." *Filippi v. Filippi*, 818 A.2d 608, 623 (R.I. 2003) (brackets omitted) (quoting *Smith v. Boyd*, 553 A.2d 131, 133 (R.I. 1989)). "Objective intent is determined by the 'external interpretation of the party's or parties' intent as manifested by action.'" *Id.* at 623-24 (quoting *Smith*, 553 A.2d at 133).

With respect to oral agreements, this Court has held that "[t]here are instances in which a party intends that his agreement to terms of a contract will have no legal consequences[,]" and in

such a scenario "there is no intent to be bound." *Smith*, 553 A.2d at 133. "In general, courts will honor such intent not to contract if the other party has reason to know of it." *Id.* "One instance in which parties may not wish their assent to particular terms to form a contract is when a written instrument is contemplated." *Id.* "Thus, where the parties understand that a written instrument is to be executed, whether an oral contract is formed may turn upon whether the party denying the contract manifested an objective intent to be bound before signing the written instrument." *Id.* at 134. "[T]he burden of proof to show an objective intent to be bound before execution of the written contract is on that party who wishes to enforce the alleged oral contract." *Id.*

The plaintiff alleges that the trial justice misapplied the law to the extent that she determined there was no binding oral agreement between the parties because no employee of defendant attended the August 27 scope meeting. Specifically, plaintiff notes two instances in the trial justice's decision in which she mentioned that no employee or representative from defendant was at the scope meeting; and plaintiff argues that, to the extent the trial justice was influenced by this fact, she misapplied the law. The plaintiff then claims that the trial justice made the wrong factual findings that Commonwealth acted as an intermediary between the parties and not as an agent of defendant with actual or apparent authority to bind defendant. In essence, plaintiff asks this Court to make a different factual finding, which would in turn require a different application of law that would inure to plaintiff's benefit.

However, our review of the trial justice's decision and the entire record of the case leads us to a contrary conclusion. Clarke testified that he was never given authority to bind defendant to a contract, never indicated to plaintiff that plaintiff had a contract with defendant, and never participated substantively in any contractual issue between plaintiff and defendant. Clarke testified that he merely passed the contract back and forth between the parties, serving as exactly

- 14 -

what the trial justice deemed him to be, an intermediary. Importantly, in her decision, the trial justice noted that Clarke's testimony was "straightforward and worthy of belief." Accordingly, we conclude that competent evidence exists within the record to support the trial justice's finding that Clarke served as an intermediary between the parties, and we will not disturb her credibility determinations. *See Cote*, 148 A.3d at 544. We therefore conclude that the trial justice did not misapply the law by relying on the fact that no employee or representative of defendant was present at the August 27 scope meeting.

Next, plaintiff alleges that the trial justice misapplied the law when she determined that there was a fundamental inconsistency between plaintiff's position that it had reached a binding oral agreement with defendant at the August 27 scope meeting, but fully intended to eventually enter into a written contract with defendant. The plaintiff parses two sentences in the trial justice's decision to support its assertion. First is where she found "that both parties intended to enter into a written instrument but failed to do so; thus, they cannot be bound to an oral contract." Second is where she noted that it was "disingenuous" for plaintiff to claim the existence of a binding oral contract on August 27, despite such extensive negotiations that occurred from August throughout November. After careful review of the trial justice's decision, we discern no such error.

An examination of the trial justice's decision reveals that she found it abundantly clear that neither defendant nor plaintiff had "manifested an objective intent to be bound before signing the written" contract. *Smith*, 553 A.2d at 134. She concluded that because defendant objectively intended to be bound by a written contract, along with plaintiff, that defendant could not be bound to an oral contract *in this case*, not that such a scenario could not exist—e.g., where a party *does* manifest an objective intent to be bound before signing the written instrument.

Additionally, when commenting on Burman's testimony, the trial justice noted her disbelief by stating that it was "disingenuous" for Burman to assert that the parties intended to be bound by an oral contract on August 27, despite such extensive subsequent negotiations that demonstrated the opposite intention. This was not a misapplication of law, but, instead, it was a characterization of Burman's credibility by the trial justice. We conclude that this does not demonstrate a "fundamental inconsistency" with basic contract law principles, but rather a straightforward application of this Court's contract jurisprudence.

The plaintiff makes several additional contentions, arguing that the trial justice erred when she (1) failed to appreciate the emergency conditions of the contract; (2) overlooked extensive evidence of substantial performance by plaintiff that indicated the parties' objective intent to be bound by the purported oral agreement; (3) relied upon Bartel's September 17 e-mail to refute the existence of an oral agreement and found that such e-mail directed plaintiff not to perform any work until a written contract was signed; (4) found that Burman "claimed" he no longer needed to finalize a written contract with defendant after being given the "green light" on the project; and (5) concluded that plaintiff's failure to assert the existence of an oral contract until late December refuted its claim to the existence of such a contract.

Our careful review of the trial justice's decision, the exhibits, and the entire record of this case lead us to the conclusion that the trial justice did not misconceive or overlook material evidence with regard to these contentions. The trial justice issued a comprehensive written decision that addressed the credibility of the witnesses, made findings of fact, and concluded that the parties did not intend to be bound by an oral contract. Although she did not mention every piece of evidence in her written decision, it is clear she considered and weighed such evidence in coming to her conclusion. *See Barbuto*, 158 A.3d at 749 ("[A] trial justice need not categorically

- 16 -

accept or reject each piece of evidence in his [or her] decision for this Court to uphold it because implicit in the trial justice's decision are sufficient findings of fact to support his [or her] rulings.") (brackets omitted) (quoting *Notarantonio v. Notarantonio*, 941 A.2d 138, 147 (R.I. 2008)).

The trial justice correctly articulated the law as enunciated by this Court. She found that Burman forwarded a written contract to defendant shortly after the August 27 scope meeting and she emphasized that the purpose of that meeting was to ensure that plaintiff grasped the extent of the roof project. She described the extensive negotiations between the parties from the time of the scope meeting until early November, which included significant changes to the contract and disputes regarding a liquidated-damages clause and the final price.

The trial justice noted Bartel's September 13 e-mail that directed plaintiff to "wait on any site visits until there is a contractual relationship between [E.W.] Burman and Bradford Dye[,]" and his September 17 e-mail that reminded plaintiff that "[a]s there is no signed contract, all work done to date and until a contract is signed, is at your own risk." The trial justice's decision indicates that she rejected the evidence plaintiff submitted in support of its argument that the e-mail was confusing and that Clarke assured Burman that there was no problem with plaintiff's contract. The trial justice found that Burman was "well aware that [p]laintiff had no signed contract with [d]efendant in September 2007," and that that fact made the directive "all that more clear: 'all work done to date and until a contract is signed, is at your own risk.'"

Moreover, the trial justice drew the reasonable inference from this finding that defendant did not want plaintiff to incur costs in connection with the project, and, if it did so, it was at its own risk. Although Burman never specifically "claimed" that he no longer needed to finalize a written contract with defendant after being given the "green light" on the project, the trial justice

drew the reasonable inference that Burman's actions indicated that he believed it to be so. Similarly, she drew the inference that, had an oral contract existed on August 27, plaintiff would have asserted its rights under that oral contract well before the time it did. Especially in light of being told to "wait on any site visits until there is a contractual relationship between [E.W.] Burman and Bradford Dye" and "[a]s there is no signed contract, all work done to date and until a contract is signed, is at your own risk."

Accordingly, we discern no error in the trial justice's findings that no oral contract existed between the parties.

## IV

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to that tribunal.

Justice Flaherty did not participate.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | E.W. Burman, Inc. v. Bradford Dyeing Association, Inc. |
| **Case Number** | No. 2018-261-Appeal.<br>(WC 08-107) |
| **Date Opinion Filed** | November 26, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Christopher C. Whitney, Esq.<br>R. Thomas Dunn, Esq.<br>Nicole M. Matteo, Esq. |
| | For Defendant:<br><br>Kathleen M. Daniels, Esq.<br>Marc DeSisto, Esq. |