May 2, 2017

**Supreme Court**

No. 2015-195-Appeal.
(WC 12-579)

Peter F. Kilmartin, Attorney General of the  :
     State of Rhode Island

              v.             :

   Joan M. Barbuto, et al.        :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Peter F. Kilmartin, Attorney General of the   :
     State of Rhode Island
           v.                     :

    Joan M. Barbuto, et al.         :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Indeglia, for the Court.**

"By the sea, by the sea, by the beautiful sea,

You and I, you and I, oh! how happy we'll be * * * ."[1]

In the instant case, we are tasked with determining who has the right to be "by the beautiful sea," specifically, whether the public has rights in a more than two-mile stretch of beach in the Misquamicut area of Westerly, Rhode Island (the disputed area). Peter F. Kilmartin, the Attorney General of the State of Rhode Island (the state), appeals from the entry of final judgment, following a bench trial, in favor of the defendants and the defendant-intervenors (defendants).[2] The state asserted that in 1909, the landowners (Plattors) of the beach property dedicated the disputed beach area to the public through the recordation of a Plat and Indenture.

---

[1] "By the Beautiful Sea," published in 1914. Harry Carroll wrote the music, and Harold R. Atteridge wrote the lyrics.

[2] Due to the multitude of defendants and defendant-intervenors in this action, we will collectively refer to them as "defendants." They are: Joan M. Barbuto; Lynne D. Kaesmann; Clarence G. Brown; Judith W. Brown; John B. Stellitano, Trustee of the John Bruno Stellitano Living Trust; James M. Tobin; Joshua M. Vocatura; Hattie G. Vocatura Trust; Nicholas P. Jarem; Sandra L. Jarem; Mickmays, LLC; Joan A. Carr; and John C. Maffe, Jr. The defendant-intervenors are: Dunes Park, Inc.; Donna Pirie; Margaret Andreo; Jane L. Taylor; David K. McGill; Miriam B. McGill; Timothy F. Shay; Brian P. Shay; Justin T. Shay; and Jeffrey A. Fiebelman, Trustee of the 627 Realty Trust. We note that additional defendants were dismissed from the action.

The state brought suit against the current beachfront landowners in the disputed area and sought injunctive relief to stop them from preventing public access to this beach area. On appeal, in addition to the state and defendants, Save the Bay and the Surfrider Foundation,[3] Pleasant View North Homeowners,[4] and the Rhode Island Coastal Resources Management Council (CRMC) and the Town of Westerly filed helpful briefs as amici curiae. We note, in particular, that the CRMC and the Town of Westerly express concern with the trial justice's suggestion that the marked rights of way on the Plat do not enable access to the shore.

After reviewing the record and considering the parties' written submissions and oral arguments, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

**A**

**The 1909 Plat and Indenture**

In July of 1909, owners of beachfront property in Westerly, Rhode Island, filed and recorded a plat map (1909 Plat or Plat) that divided that property.[5] The 1909 Plat, entitled "PLAN OF PLEASANT VIEW BEACH LOTS," was signed by the Plattors, the original five sets of property owners: the Winnapaug Company; William and Alzada Saunders; A.B. and Mary Stark Crafts; Harris Chapman; and Albert and Melissa Langworthy. The 1909 Plat shows

---

[3] Save the Bay and the Surfrider Foundation, joined by Rhode Island Saltwater Anglers Association, Clean Ocean Access, and Friends of the Waterfront, Inc., jointly filed an amicus brief in support of the state.

[4] Pleasant View North Homeowners, which describes itself as "an unincorporated association consisting of private persons who own properties on the north side of Atlantic Avenue," filed an amicus brief seeking reversal of the trial justice's decision.

[5] As a picture is worth a thousand words, see the 1909 Plat Map appended as Exhibit A.

multiple lots that are separated by dashed lines, easterly and westerly, and are bounded by Atlantic Avenue on the north.

While the northerly, easterly, and westerly lot boundaries are undisputed, the properties' southerly limit is contested. Running below the lots, to the south, is an undulating line labeled the "line of foot of bank." Below the line of foot of bank lies an area labeled "Beach," the disputed area at the center of this litigation.[6] Notably, the beach area is not divided by the dashed lines that demark the lots' easterly and westerly boundaries, and the dashed lines do not run through the line of foot of bank. Below the beach area lies the "Atlantic Ocean," which is separated from the beach area by multiple undulating lines. In addition to the many lots, the Plattors also carved out nine rights of way, marked as such on the plat, which run from Atlantic Avenue to the beach area.

Along with the 1909 Plat, the Plattors prepared, signed, and recorded an Indenture. In pertinent part, the Indenture states:

> "Wherein the several parties to this instrument either own or have interests in certain land situated in Westerly between the Winnapaug road on the West, and the Bridge over the Breach on the East, the highway known as Atlantic Avenue on the North and the ocean on the South all as shown and platted on a survey and plan attached hereto * * * and the several parties desire and intend to develop and sell their several properties for building lots in cooperation * * * ."

In the Indenture, the Plattors also discuss the rights of way: "[T]he spaces indicated on said plan as a public walk or right of way will be set apart and kept open and are dedicated as a public walk and right of way from said highway to the Beach * * * ."

---

[6] For purposes of this opinion, the phrases "beach area" and "disputed area" are used interchangeably and both reference the area marked as "Beach" on the 1909 Plat.

# B

# Travel

On October 2, 2012, in an amended complaint, the Attorney General, as "trustee of the public beach," brought an action in the Washington County Superior Court asserting that the Plattors dedicated the disputed area to the public through the 1909 Plat. In its amended eight-count complaint against the beachfront landowners, the Attorney General alleged public nuisance, purpresture, private nuisance, trespass, and unreasonable use of easement. The state sought to enjoin the landowners from preventing public access to the beach area.[7]

On November 2, 2012, defendants moved pursuant to Rule 19 of the Superior Court Rules of Civil Procedure to dismiss the state's complaint for its failure to join persons needed for a just adjudication, or, alternatively, to require joinder of those persons. On November 30, 2012, the trial justice ordered the state to notify all landowners in the disputed area, as depicted on the 1909 Plat, and he allowed such landowners to intervene in the action.

The defendants answered and sought a declaration that they were the true property owners of the disputed area, with respect to their individual lots. The defendants also brought a counterclaim and asserted that: They owned their property through adverse possession; they acquired their property pursuant to G.L. 1956 § 34-13.1-2 of the Marketable Record Title Act; the state is liable for slander of title; and the state's conduct constituted a temporary taking of defendant's property in violation of the constitutions of the United States and the State of Rhode Island.[8]

---

[7] In its complaint, the state originally asserted that the incipient dedication gave it a fee interest in the disputed area. After trial, however, the state clarified that it sought only a public easement over the beach area.

[8] Through a stipulation dated April 11, 2013, the counterclaims alleging slander of title and an unconstitutional taking were dismissed.

The defendants moved for summary judgment, and the state filed a cross-motion for summary judgment and a motion for summary judgment on defendant-intervenors' counterclaim to quiet title. The trial justice heard the parties' arguments, and, on September 25, 2013, denied the three summary-judgment motions. The trial justice determined that there was a genuine issue of material fact with respect to whether the Plattors intended a public dedication. Further, he concluded that "[t]he nature and volume of the pertinent evidence offered by plaintiff and defendants necessitate[d] a factual determination by the trial justice."

## C

### Trial

On April 1, 2014, a lengthy bench trial commenced before the same trial justice. The parties agreed to a bifurcated format; phase one of the trial focused on whether the original 1909 Plattors intended to dedicate the disputed area to the public, and, if the trial justice found that the Plattors did intend to dedicate, the parties would reach phase two of the trial, which would address whether the public accepted the Plattors' offer of dedication.[9] Over the course of phase one of the trial, the state presented seven witnesses and introduced over 200 documents; defendants presented three witnesses and also introduced over 200 documents. Below we summarize the relevant testimony adduced at trial.

The state first called Alfred G. Thibodeau, an attorney licensed in Rhode Island, whose primary practice area was real estate conveyances and title searches. Thibodeau testified that he reviewed the 1909 Plat. He stated that the 1909 Plat demonstrated that the owners were trying to achieve a common-development scheme because the plat was a composite plan by five separate

---

[9] Because the trial justice determined that there was no dedication, phase two of the trial was unnecessary and final judgment entered.

owners, when each property owner could have instead developed their lots on separate plans. Thibodeau said that it was necessary to review the Indenture to understand the Plat. When asked whether he deemed the line of foot of bank to be a representation of a natural feature or a boundary, he responded that it was a boundary because the dashed lines separating the lots run to and stop at the line of foot of bank.

Thibodeau interpreted the Indenture's language that the rights of way run from Atlantic Avenue "to the Beach" as a right of way granting public beach access and use. "Otherwise," Thibodeau stated, "whats [sic] the point of getting people up to the line at the beach * * * ." He opined that the 1909 Plat and Indenture "create[] public rights in the rights of way and on the beach, and it also creates private rights to any purchases of individual lots to the rights of way and the beach." Thibodeau suggested that, even without the Indenture, the Plat still illustrated a public dedication because it showed "the beach as a separate area on the [P]lat with access to it."

Alfred DiOrio, a professional land surveyor, testified next. DiOrio stated that he was familiar with the 1909 Plat as he had completed multiple surveys in the Atlantic Avenue area. He described the plat: There are lines indicating Atlantic Avenue; at the southerly limits of Atlantic Avenue, there is a series of beach lots; and continuing southerly, there is line work termed "line of bank and line of foot of bank." DiOrio detailed the line of foot of bank as "an irregular undulating line that runs southerly of the beach lots." Further south on the 1909 Plat, DiOrio testified, there is "an open area identified as beach" and then line work that signifies "the edge of a water body," specifically the Atlantic Ocean. He noted that the 1909 Plat lacked a legend indicating the meaning of the various line types utilized.

DiOrio discussed the several boundaries shown on the 1909 Plat, the first being Atlantic Avenue, which is "shown in a bold or continuous line type, continuing southerly." Demarking

the easterly and westerly beach lot boundaries is "a dashed line type." He noted that the dashed lines that separate the beach lots extend from Atlantic Avenue but stop at the line of foot of bank and do not extend beyond that line towards the Atlantic Ocean. DiOrio testified that this demonstrates that the Plattors "fully intended that those lot lines terminate at the line of the bank." He noted, however, that this opinion was based solely on the 1909 Plat, without considering deeds or other evidence of the Plattors' intent. DiOrio stated that he reviewed many deeds arising out of the Plat, and he testified that "as soon as the deeds start to talk about being bounded southerly by * * * the sea, the ocean, the Atlantic Ocean, now we have an ambiguity * * * . * * * We have a bounding description that clearly calls for the Atlantic Ocean as the southerly boundary."

Grover Fugate, the executive director of the CRMC, testified next. Fugate said that during his time at the CRMC, he had supervised over 20,000 permits and thousands of enforcement proceedings. Fugate noted that the Division of Harbors and Rivers (DHR), the agency responsible for overseeing the area below the mean high water mark,[10] existed prior to the CRMC's creation, which then absorbed the DHR's powers.

In his testimony, Fugate discussed a 1969 letter from the then-chief of the DHR to defendant, Clarence Brown, regarding defendant's application to the DHR to erect a fence. In the letter, the DHR chief stated that the fence could be built to the mean high water mark but reminded Brown that the waters were within the public domain and therefore must be kept open and accessible. Fugate explained this response, however, by stating that the DHR did not concern itself with anything above the mean high water mark, over which it lacked jurisdiction.

---

[10] For purposes of this opinion, we treat the phrases "mean high water mark," "mean high tide line," and "mean high water line" as synonymous.

Rather, the DHR, in accordance with the Rhode Island Constitution,[11] was concerned only with public property below the mean high water mark. Fugate testified that "[t]he general assumption is * * * that anything above the mean high water mark was probably in some sort of private property without going and doing a title investigation that would be sort of the general assumption." He further noted that, regardless, the DHR chief lacked authority to determine the property's boundary.

The state next called Steven Corey, a history professor and department chair at Columbia College of Chicago. Corey described himself as a social historian who specialized in environmental history and urban history.[12] He testified that he examined the history of Pleasant View, the area now called Misquamicut, wherein the disputed area lies. Specifically, Corey stated that he researched Pleasant View's development as a summer beach colony between the 1890s and 1920s. For this research, Corey reviewed local history collections and Westerly land records, including the 1909 Plat.

Corey discussed a trolley that arrived in Pleasant View in 1912. He testified that the trolley traveled along Atlantic Avenue to the Weekapaug breachway, the disputed area's easternmost boundary, to bring people to Misquamicut for day excursions, such as beach visits. He discussed the trolley company's incentive for ridership: "[B]y extending the railway line, they were certainly hoping * * * to have people taking day excursions to Pleasant View and

---

[11] Article 1, section 17 of the Rhode Island Constitution provides in pertinent part:
> "The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state, including but not limited to fishing from the shore, the gathering of seaweed, leaving the shore to swim in the sea and passage along the shore * * * ."

[12] Corey defined "urban history" as "the study of the process of urbanization," which is the "concentration of population and processes that create the concentration of population and where people live in regions."

going and enjoying the beach at Pleasant View." Corey noted that the Winnapaug Company, one of the Plattors, "was part of the trolley company in terms of holdings." With respect to the property developers' perception of the beach, Corey noted that "[i]t's clear that the promoter * * * and the realtor and those who [were] promoting the beach [saw] that as one continuous beach." He testified that the Plattors viewed the beach as "one whole continuous beach;" and, in support, he explained that the Plattors planned to build an oceanfront boardwalk.

Next, David Thompson, tax assessor for the Town of Westerly, testified. As tax assessor, Thompson maintained responsibility for valuing real estate, personal property, and vehicles, and for maintaining and updating the town's tax assessor's plat maps. Thompson was shown a tax map of the Atlantic Avenue area that was recorded in the 1940s or 1950s and testified that it depicted the southerly boundary as "the line above the mean high tide line," which equates with the line of foot of bank. With respect to the rights of way shown on the tax map, Thompson also testified that their southerly boundary was the line above the mean high tide line.

Thompson then viewed the current tax map of the disputed area, which was prepared in 1980. He noted that the southerly boundary on the current tax map differed from the one shown on the 1940s-50s tax map, in that the eastern and western lot boundaries now extend from Atlantic Avenue to the mean high tide line. Thompson testified that the current tax map depicted the southerly boundary as the mean high tide line and that, therefore, the lots are depicted as extending to the Atlantic Ocean.

Janet Freedman, a coastal geologist at CRMC, was the next witness. Freedman noted her familiarity with the 1909 Plat and stated that she had visited the disputed area in recent years. Freedman described the area: There is a cleared right of way, a low-grade slope onto the beach, and then the beach itself, which is fairly flat. She then discussed the conditions of the disputed

area in July of 1909, when the Plat and Indenture were recorded. She testified that the beach would have looked the same, but it was farther seaward than it is at present. Freedman testified that she used technology to project the Plat onto a 2008 aerial photograph of the disputed area, which revealed that the line of foot of bank has eroded and migrated northerly. Freedman explained, however, that "the beach is still a beach. * * * It's just in a different place a little f[a]rther north."

The state's next witness was Paul Leblanc, the Westerly town engineer. After viewing the 1909 Plat, Leblanc was asked if he could determine whether the easterly and westerly division lines dividing the lots extended to the line of foot of bank or elsewhere. Leblanc testified that he checked the measurements by relative scale and determined that the lines were limited to the line of foot of bank. He stated, however, that it was unclear whether the line of foot of bank was the lots' southerly boundary because it was not called the "southerly project limits or property limits." Nevertheless, Leblanc testified that, if the Plattors intended to extend the property lines to the mean Atlantic Ocean, "those lines would have been extended through that physical feature to the ocean's edge." Leblanc concluded that "[t]he plan clearly is up for interpretation where that southerly boundary is."

Leblanc was then shown the 1924 Westerly Water Works plan. He concluded that the plan was made (transferred and transposed) from a plat, such as the 1909 Plat. He interpreted a line running parallel and above a line marked ocean to be the line of foot of bank as depicted in the Plat. The line of foot of bank displayed on that plan, however, did not have breaks in the undulating line as the 1909 Plat's line did. Leblanc noted that the plan did not reference the line of foot of bank as a boundary line. He also testified about a plan prepared for the Town of Westerly, which Leblanc said was prepared as a reference plan showing "the dedicated public

access points from the Atlantic Avenue right of way to the beach area." His attention was directed to a line on the plan labeled as the approximate mean high water line. Parallel above that line was a line labeled "approximate lot limit as shown on plan." Leblanc testified that this line represented the line of foot of bank depicted on the Plat.

At the close of the state's case, defendants moved for judgment as a matter of law pursuant to Rule 52(c) of the Superior Court Rules of Civil Procedure, but the trial justice reserved decision.[13]

The first witness for the defense was Joseph A. Priestley Jr., an attorney from Westerly, whose practice focused on "land related or administratively related" matters. Priestley described the Plat as a subdivision plan, which, by present-day standards, would have been "taken before a planning board and approved by the planning board." In his testimony, Priestley discussed which lines on the 1909 Plat represent boundary lines. He testified that the line at Atlantic Avenue and the dashed lines separating the lots are boundary lines, but he was unable to determine the southerly boundary because "the dashed lines [that separate the lots] run occasionally to the line at the foot of the bank or stops [sic] near it, but there are certain exceptions * * * [where] the dashed lines go between a gap in that line and continue f[a]rther south." Priestley testified that the line of foot of bank's "fairly significant" break and the places where the dashed line runs past the line of foot of bank, indicate that it was not intended as a boundary line. Priestley opined that, if the line of foot of bank was intended as a boundary line, "it would continue without an unexplainable break." He noted that the Indenture clarified that

---

[13] "In a nonjury case, a party may move for judgment as a matter of law after the presentation of an opponent's case, in accordance with Rule 52(c) of the Superior Court Rules of Civil Procedure." Hernandez v. JS Pallet Co., 41 A.3d 978, 983 (R.I. 2012). Under Rule 52(c), "the court may enter judgment as a matter of law against the party who has been fully heard on an issue, but '[s]uch a judgment shall be supported by findings of fact and conclusions of law * * * .'" Hernandez, 41 A.3d at 983 (quoting Rule 52(c)).

the southerly side of Atlantic Avenue, above the lots, is an intended boundary; however, it was not helpful in determining whether the line of foot of bank is a boundary line.

Priestley testified that he had reviewed all of the deeds that arose out of the 1909 Plat, which amounted to about 200 deeds. He looked "at each conveyance of each of the lots shown on the 1909 map by the owner and * * * the great majority of those were described by bounding southerly on the ocean with the description of the lot number of various restrictions." Priestley discussed a particular deed from one of the Plattors, the Saunderses, which reserved rights and warranties for them to enter the beach to remove seaweed from it. He noted that "seaweed rights" reservations were common in many of the deeds out of the Plat. He stated that the Saunderses' deed also contained a condition that gave the grantors (the Saunderses) a right to enter and repossess the land upon a breach by the grantee. Priestley answered in the negative when asked whether such reservations are consistent with a public dedication to the beach. He noted that language in the Saunderses chain that warranted the property against encumbrances and agreed to defend title is also inconsistent with the allegation of public dedication of the beach area, which would be a violation of the implied covenant of quiet enjoyment.

Priestley testified that the Langworthy Plattors granted private easements to certain individuals who lived outside of the 1909 Plat, including two rights of way over one of the lots to the Atlantic Ocean, and another private right of way to reach the ocean. When asked if the Plattors conveyed any public beach rights, Priestley testified that the marked rights of way are reserved to the public and "extend from Atlantic Avenue through that area at the same width to the shore of the ocean." He opined that these marked rights of way grant the public "[t]he right to pass to the beach and to walk back and forth across it." He added, "I think they meant beach * * * in the historic way as the land below the mean high tide line and above the mean low water

- 12 -

[line] where you can walk." Priestley expressed his belief that the only right conveyed with respect to the dry sand portion of the beach was "the right to pass across it as a continuation of the rights of way from Atlantic Avenue * * * ."

It was his testimony that, after reviewing the deeds, the 1909 Plat, and the Indenture, he concluded that the Atlantic Ocean—not the line of foot of bank—is the southerly boundary. To support this opinion, Priestley noted that the lots that pre-existed the Plat all showed the Atlantic Ocean as its boundary, and nearly all conveyances in the Plat chain listed the Atlantic Ocean as the boundary.

Nathan Lauder, a professional land surveyor for over thirty-five years, testified next. He stated that he had completed many surveys in Misquamicut and that he had encountered the 1909 Plat in connection with that work. Lauder testified that the properties' southerly boundary is unclear from the 1909 Plat, and it was therefore necessary to look at each property's deed description. Lauder noted that many of the deeds contained a "bounds description" stating that the property was bounded by the Atlantic Ocean. Lauder testified that such descriptions were "monument calls," and he described "a monument" as "something that has come to be recognized as identifiable on the ground that you can see, you can touch; such as Atlantic Avenue."

Lauder testified that, prior to the commencement of this suit, he prepared a survey for one of defendants to determine his property's southerly boundary and concluded that it was the mean high water line. He stated that, in 2008, he performed a survey for another defendant for a building-permit application. Again, he determined that the property's southerly boundary was the mean high water line. Lauder testified that, in 2002, about ten years prior to this litigation, he prepared a survey for defendant, Dunes Park, Inc., which lies at the easternmost end of the Plat.

The survey was prepared so that Dunes Park, Inc. could make improvements that required environmental and regulatory permits. This survey showed the southerly boundary as the mean high water line.

The defendants' final witness was Richard H. Strause, an engineer and land surveyor employed at C.M.E. Associates, the successor engineering firm to the firm that prepared the 1909 Plat. Strause testified that he obtained the predecessor firm's historic maps and field books associated with the Plat. Although he found the original field books associated with the Plat, they did not reference the proposed southerly boundary. After reviewing the Plat, Strause testified that, considered alone, it contained insufficient information to determine the southerly boundary. Given the ambiguity of the southerly boundary based on the 1909 Plat, Strause testified that he "would look to the deed for the intent of the conveyance."

At the close of their case, defendants again moved under Rule 52(c) for findings and conclusions on "the issue of whether the 1909 [P]lat accomplished the dedication of the disputed areas." The state rephrased the issue as whether there was an offer of incipient dedication. The trial justice requested briefing and oral argument on the motion. The parties submitted posttrial briefs and reply briefs to the trial justice. On July 2, 2014, the trial justice heard the parties' posttrial arguments.[14]

### D

### The Trial Justice's Decision

On September 4, 2014, the trial justice issued a written decision. He noted that the threshold issue before him was whether the 1909 Plat, along with the Indenture's language,

---

[14] It is unclear whether the trial justice rendered an ultimate decision on the Rule 52(c) motion or whether it was disposed of in the context of his final decision. In any case, judgment was entered for defendants on March 24, 2015.

demonstrated the Plattors' manifest intent for a public dedication of the beach area. Before reaching that issue, however, the trial justice first determined whether the Plattors had the power to dedicate an easement over the beach area through the 1909 Plat and Indenture. He found that the Plattors lacked the power to dedicate because they did not own all of the area that was allegedly dedicated. In describing each Plattor's interest in the disputed area, the trial justice stated that "each individual owner of a lot along Atlantic Avenue has an exclusive ownership interest in fee in a strip of land that extends from the southern boundary of Atlantic Avenue all the way to the Atlantic Ocean;" he added that, as such, "the Disputed Area labeled as 'Beach' on the 1909 Plat is owned by more than one individual, but each individual owns, exclusively, a piece of the aggregate whole." Because at least four lot owners depicted on the Plat (aside from the Plattors) signed neither the Plat nor the Indenture, the trial justice determined that the Plattors lacked the power to dedicate an easement over property that they did not own and any portions that they did own. Although he noted that this finding "should end the inquiry," the trial justice nonetheless addressed the merits of the remaining legal questions.[15]

The trial justice then discussed whether the 1909 Plat and Indenture, read together as a single instrument, clearly and unambiguously show the Plattors' manifest intent to dedicate the beach area to the public. To do so, he first analyzed the lines and markings on the Plat. He compared the lines used for Atlantic Avenue's northern and southern boundaries with the line of foot of bank. He noted that the former are "thick, straight, uninterrupted lines containing, at frequent intervals, survey markers pronouncing angle and distance measurements and have a clear beginning and end point," whereas the line of foot of bank is made up of six separate

---

[15] We note that in its papers before us, plaintiff asserts that the trial justice erred in concluding that the Plattors lacked the power to dedicate any portion of the beach area because they did not own the entire area. At oral argument, however, defendants conceded that the Plattors had the power to dedicate. Accordingly, we need not address this issue.

undulating lines, contains no survey markers, and has no beginning or end point. Additionally, the trial justice noted that the dashed easterly and westerly lot boundaries and the dashed property "set-back line" intersected the line of foot of bank in places.

The trial justice deemed inapplicable the common-law presumption of intent to dedicate when a road is shown on a plat because the Plattors did not view the beach area as a road or street. He held that merely labeling the disputed area "Beach" was insufficient to demonstrate intent to dedicate an easement on the property. Further, the trial justice surmised that the Plattors knew how to dedicate property to the public, as shown by their dedication of the rights of way, which they clearly articulated were "hereby dedicated to public use" in the Indenture. Notably, the Plattors did not use such language with respect to the beach area. Accordingly, the trial justice determined that the 1909 Plat and Indenture did not clearly and unambiguously demonstrate intent to dedicate an easement over the beach area.

The trial justice was careful to distinguish "a finding that the 1909 Plat and the Indenture do not clearly and unambiguously reflect the Plattors' intention to dedicate an easement over the Beach Area to the general public" from "a finding that the 1909 Plat and the Indenture are unclear or ambiguous." Therefore, he still had to analyze those instruments, in and of themselves, to determine if they were ambiguous. In that regard, the trial justice stated that an instrument is ambiguous if it is subject to more than one reasonable interpretation. Finding unreasonable the state's interpretation that the instruments demonstrated the Plattors' intent to dedicate, he deemed the Plat and Indenture to be clear and unambiguous.

Having found the 1909 Plat and Indenture unambiguous, the trial justice noted that he could not consider extrinsic evidence to determine the question of dedicatory intent. Nonetheless, the trial justice offered his alternative analysis that, had he found the 1909 Plat and

Indenture ambiguous, he would have held that the extrinsic evidence was insufficient to resolve any hypothetical ambiguity in the state's favor. The trial justice deemed irrelevant the extrinsic evidence of surveys, tax assessor plans, communication between state agencies and beachfront property owners, and "second-generation" deeds. Instead, he found the "most important body of extrinsic evidence" to be: the first deeds out from the Plattors, documents concerning the Plat that were produced up to the recording of the Plat and Indenture, and expert testimony about the meaning of the Plat's lines and markings. With respect to the first deeds out of the Plat, the trial justice found that the "beach rights" reservations within the deeds were referring to "preexisting covenants that landowners may have had with these third parties, and not reflective of easement rights in the Beach Area held by the public at large."[16] Also, the trial justice was persuaded that the evidence revealed that the Plattors intended the line of foot of bank to represent a geographic feature, not a boundary. Lastly, the trial justice determined that the Indenture's language that the rights of way go "to the Beach"[17] did not indicate that the Plattors intended to grant an easement over the entire beach area. Going further, he questioned whether the rights of way even extended to the shore line. As previously noted, the CRMC and the Town of Westerly are concerned that the trial justice cast doubt on whether the rights of way provide any public access to the shore, as the CRMC had previously designated that they do. We regard the trial justice's statements with respect to the rights of way as <u>obiter</u> dicta. Thus, those statements do not in any way disturb the CRMC's designations that the rights of way provide public access to the shore.

---

[16] Specifically, the trial justice was referencing two post-1909 Plat deeds, introduced by the state, executed in 1911 wherein the deed stated that the conveyances were "subject to * * * beach rights, as per plan."

[17] The phrase "to the Beach" appears in the context of the Plattors' dedication of the rights of way: "the spaces indicated on said plan as a public walk or right of way will be set apart and kept open and are dedicated as a public walk and right of way from said highway <u>to the Beach</u> * * * ." (Emphasis added.)

- 17 -

Based on the foregoing analysis and findings, the trial justice concluded that the 1909 Plat and Indenture did not reveal the Plattors' manifest intent to dedicate an easement over the beach area, and he deemed the 1909 Plat and Indenture clear and unambiguous. The trial justice further found that, even if he had deemed the 1909 Plat and Indenture ambiguous, the extrinsic evidence did not demonstrate a manifest intent to dedicate a public easement over the beach area.

## E

## Appeal

The state appealed to this Court on March 31, 2015.[18] In pertinent part, it argues that: (1) the 1909 Plat clearly and unambiguously demonstrates the Plattors' intent to dedicate the disputed area; and (2) even if the 1909 Plat was ambiguous, the extrinsic evidence reveals the Plattors' intent to dedicate the beach. Among the arguments that defendants raise on appeal is that the state should be judicially estopped from asserting that the disputed area was dedicated to the public because such position is contrary to ones that it previously held.[19]

---

[18] The trial justice entered final judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure on plaintiff's amended complaint, in favor of defendants. Rule 54(b) provides, in pertinent part:

> "When more than one (1) claim for relief is presented in an action, * * * the court may direct the entry of a final judgment as to one (1) or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

[19] "[J]udicial estoppel focuses on the relationship between the litigant and the judicial system as a whole." D & H Therapy Associates v. Murray, 821 A.2d 691, 693 (R.I. 2003). This equitable doctrine is "driven by the important motive of promoting truthfulness and fair dealing in court proceedings." State v. Lead Industries Association, Inc., 69 A.3d 1304, 1310 (R.I. 2013) (quoting Murray, 821 A.2d at 693). To support their judicial estoppel argument, defendants cite to State v. Ibbison, 448 A.2d 728, 729-30 (R.I. 1982), wherein the state prosecuted individuals for trespassing upon the beach area above the mean high tide line. We need not laboriously address this issue, however, because the trial justice did not invoke this doctrine, nor did he mention or rely on Ibbison in reaching his decision.

- 18 -

## II

### Standard of Review

"It is well established that the factual findings of a trial justice sitting without a jury are accorded great weight and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." Cote v. Aiello, 148 A.3d 537, 544 (R.I. 2016) (quoting Wellington Condominium Association v. Wellington Cove Condominium Association, 68 A.3d 594, 599 (R.I. 2013)). "This Court consistently has held that factual findings of a trial justice sitting without a jury are granted an extremely deferential standard of review." Id. (quoting State v. Gianquitti, 22 A.3d 1161, 1165 (R.I. 2011)); see also Providence and Worcester Co. v. Exxon Corp., 116 R.I. 470, 486, 359 A.2d 329, 338 (1976) ("[T]he drawing of an inference is initially the function of the trier of facts. The trial justice's conclusion will be accepted by this [C]ourt if the inference he drew was reasonable even though other equally reasonable inferences to the contrary might have been drawn."). We review de novo questions of law and statutory interpretation. Cote, 148 A.3d at 544.

## III

### Discussion

### A

### Burden of Proof

At the outset, we resolve the dispute concerning the state's burden of proving that the Plattors intended a public dedication. The state asserts that the burden of proof is by a preponderance of the evidence, whereas defendants contend that the state's burden of proof is by

clear and convincing evidence.[20] While the burden of proving an incipient dedication does not fall squarely within either of the formulations proffered by the parties, it is nevertheless well-settled. This Court has long held that the proponent of a dedication must show "a manifest intent by the landowner to dedicate the land in question[.]" Warwick Sewer Authority v. Carlone, 45 A.3d 493, 500 (R.I. 2012) (quoting Robidoux v. Pelletier, 120 R.I. 425, 433, 391 A.2d 1150, 1154 (1978) (emphasis added)). "[E]xistence of an intent to dedicate will not be lightly presumed. Evidence must be shown which reasonably tends to demonstrate such an intent." Drescher v. Johannessen, 45 A.3d 1218, 1230 (R.I. 2012) (quoting Volpe v. Marina Parks, Inc., 101 R.I. 80, 86, 220 A.2d 525, 529 (1966)).

As the trial justice held, "proof that reasonably tends to demonstrate the Plattors' intent" must be found from the 1909 Plat and Indenture, considered together. Guided by these principles, we will determine whether the trial justice erred in finding that the evidence the state put forth failed to demonstrate manifest intent by the Plattors to dedicate the beach area.

## B

### Dedication

It is well-settled that the dedication of property to the public is "an exceptional and unusual method by which a landowner passes to another an interest in his [or her] property." Newport Realty, Inc. v. Lynch, 878 A.2d 1021, 1032 (R.I. 2005) (quoting Robidoux, 120 R.I. at 433, 391 A.2d at 1154). A valid dedication requires: "(1) a manifest intent by the landowner to dedicate the land in question, called an incipient dedication or offer to dedicate; and (2) an acceptance by the public either by public use or by official action to accept the same on behalf of

---

[20] We note that a proponent must prove the second element of incipient dedication, public acceptance of the offer of dedication, by "clear and convincing" evidence. Drescher v. Johannessen, 45 A.3d 1218, 1231 (R.I. 2012) (quoting Vallone v. City of Cranston, Department of Public Works, 97 R.I. 248, 254, 197 A.2d 310, 314 (1964)).

the municipality." Warwick Sewer Authority, 45 A.3d at 500 (quoting Robidoux, 120 R.I. at 433, 391 A.2d at 1154). "[A]n intent to dedicate will not be lightly presumed. Evidence must be shown which reasonably tends to demonstrate such an intent." Drescher, 45 A.3d at 1230 (quoting Volpe, 101 R.I. at 86, 220 A.2d at 529).

Under the doctrine of incipient dedication, we have recognized that "the recordation of a plat with streets delineated thereon and lots sold with reference to the plat reveals the owner's intent to offer the streets to the public for use as ways." Newport Realty, Inc., 878 A.2d at 1033 (quoting Robidoux, 120 R.I. at 434, 391 A.2d at 1155). Incipient dedication "is a time-honored method for platting streets and roads and conveying lots with reference to the plat." Id. In most cases of incipient dedication, "the filing and the acceptance of a plat plan are sufficient evidence of a landowner's intent to dedicate land for road purposes * * * ." Donnelly v. Cowsill, 716 A.2d 742, 748 (R.I. 1998).

## C

### The 1909 Plat and Indenture

The state maintains that the 1909 Plat and Indenture clearly and unambiguously demonstrate the Plattors' intent to dedicate the disputed property. The state points to three legal errors that it contends the trial justice made in interpreting the Plat and Indenture: He (1) misread the lines and markings on the Plat; (2) erroneously concluded that the rights of way did not grant any rights in the beach area; and (3) improperly narrowed the doctrine of incipient dedication to roadways.

Whether the beach area is public "hinges 'on the owner's intent at the time the plat is recorded and the lots are sold.'" Drescher, 45 A.3d at 1230 (quoting Newport Realty, Inc., 878 A.2d at 1033). Although sometimes "a recorded plat is all that is needed to disclose a

landowner's dedicatory intent[,] * * * [v]ery often lines and figures drawn on a land-development plat may be unclear as to their intended purpose." Id. at 1231 (quoting Robidoux, 120 R.I. at 434, 391 A.2d at 1155). In that regard, "it is the task of the factfinder to interpret the meaning of the disputed item by careful scrutiny of all lines, figures, and letters that appear on the map as well as whatever pertinent evidence may be adduced by the litigants." Robidoux, 120 R.I. at 434, 391 A.2d at 1155.

In making this determination, the trial justice's first task was "to examine the plat, particularly the lines and declarations that relate to the disputed land, to determine whether this evidence gives rise to a finding of no dedicatory intent or whether it is ambiguous." Newport Realty, Inc., 878 A.2d at 1034. The trial justice carefully examined the lines and markings on the 1909 Plat and Indenture to determine the Plattors' intent. He first compared the lines used for the Atlantic Avenue boundaries with the line of foot of bank and correctly noted that the Atlantic Avenue boundaries are "thick, straight, uninterrupted lines," whereas the line of foot of bank is an undulating line that breaks in six places. The trial justice then discussed the Atlantic Ocean boundary, which he described as "a series of very narrow undulating lines." He likened this line to the line of foot of bank, noting that neither contains "surveyor's benchmarks depicting angles, distances, or other measurements," as the Atlantic Avenue boundaries do. Based on the vast differences between the Atlantic Avenue boundary lines and those bounding the beach area, the trial justice recognized that the Plattors did not regard the beach area as being the same as roadways for purposes of incipient dedication. The trial justice noted that, while dedication can be presumed in most roadway dedications, here the Plattors needed to do more than merely label the disputed area "Beach" to demonstrate manifest intent to dedicate it. See Donnelly, 716 A.2d at 748 ("[S]imply placing a line or a mark on a plat or delineating a way or a

- 22 -

street for boundary purposes is insufficient to establish conclusively the original owner's intent to offer the property for dedication.").

The Indenture further supports the trial justice's conclusion that the Plattors did not intend a public dedication of the beach area. As he noted, the Plattors were certainly aware of how to dedicate property to the public because they successfully did so with the nine rights of way. In the Indenture, the Plattors stated that "the spaces indicated on said plan as a <u>public</u> <u>walk</u> <u>or</u> <u>right</u> <u>of</u> <u>way</u> * * * <u>are</u> <u>dedicated</u> <u>as</u> <u>a</u> <u>public</u> <u>walk</u> <u>and</u> <u>right</u> <u>of</u> <u>way</u> from said highway to the Beach * * * ." (Emphasis added.) As the trial justice noted, "[n]o such language is connected to the Disputed Area labeled simply as 'Beach' on the 1909 Plat, and described simply as 'the Beach' on the Indenture." Based on his analysis of the Plat and Indenture, he concluded that the instruments did not "clearly and unambiguously reflect the Plattors' intention to dedicate an easement to the general public over the Beach Area * * * ."

The state argues, however, that the trial justice "ignored key parts" of the Plat and Indenture in his decision. Specifically, it maintains that he disregarded the dimensions that show that the lots end before the mean high tide line. We deem this contention unavailing. As we outlined above, a review of the trial justice's decision reveals that he carefully analyzed the Plat's lines and markings and the Indenture's language. Although he did not expressly discuss certain characteristics of the Plat and Indenture, "[a] trial justice need not 'categorically accept or reject each piece of evidence in his decision for this Court to uphold it because implicit in the trial justice[']s decision are sufficient findings of fact to support his rulings.'" <u>Notarantonio v. Notarantonio</u>, 941 A.2d 138, 147 (R.I. 2008) (quoting <u>Narragansett Electric Co. v. Carbone</u>, 898 A.2d 87, 102 (R.I. 2006)).

- 23 -

The state also challenges the trial justice's finding that the line of foot of bank is not the southerly boundary and asserts that this "is an error of law." It cites to Nye v. Brousseau, 992 A.2d 1002 (R.I. 2010) for the proposition that "the issue of what constitute[s] the boundaries of a parcel of land is a question of law."[21] Id. at 1009 (quoting Norton v. Courtemanche, 798 A.2d 925, 932 (R.I. 2002)). We are not convinced, however, that the trial justice made a conclusive finding about the property's southerly boundary. He merely stated that he was persuaded by the evidence that the line of foot of bank "reflects the Plattors' intention to depict a geographic feature, not the boundary of an easement or a right of way." Any findings made regarding the line of foot of bank and the lots' southerly boundary were made only to assist the trial justice in determining the Plattors' intent. He was not charged with determining the southerly boundary of the lots, but rather with deciding whether the Plattors intended to dedicate the beach area to the public.

The state also contends that the trial justice erred in not finding that the Indenture's language "to the Beach" granted implied easement rights to the public to use the beach. To support this argument, the state relies upon cases from other jurisdictions where courts held that easements "to the beach" implied easement rights in the beach. See generally Anderson v. De Vries, 93 N.E.2d 251 (Mass. 1950), abrogated by M.P.M. Builders, LLC v. Dwyer, 809 N.E.2d 1053 (Mass. 2004); Murphy v. Olsen, 826 N.E.2d 249 (Mass. App. Ct. 2005).

We are unpersuaded, however, by the cases cited by the state. The determination of manifest intent is a fact-intensive inquiry and such intent is lacking here. See Robidoux, 120 R.I. at 433, 391 A.2d at 1154 ("Whether a landowner has made an offer to dedicate his property to

---

[21] "[A]lthough, 'the issue of what constitute[s] the boundaries of a parcel of land is a question of law, the determination of where such boundaries are is a question of fact.'" Nye v. Brousseau, 992 A.2d 1002, 1009 (R.I. 2010) (quoting Norton v. Courtemanche, 798 A.2d 925, 932 (R.I. 2002)).

the public is purely a question of determining from the facts of the particular case the owner's intent."). The present case is clearly distinguishable from those relied upon. See Anderson, 93 N.E.2d at 256 (The Massachusetts Supreme Judicial Court's conclusion that an easement "to the beach" encompassed an easement to use the beach did not involve rights gained through the recording of a plat); Murphy, 826 N.E.2d at 251 (The Massachusetts Court of Appeals held that an easement "to the beach" granted an easement to use the beach because deeds included a "beach use" clause that granted "the right to use [the beach] for its entire length for walking, swimming, sunbathing, fishing, shellfishing and other recreational purposes * * * .").

We also reject the state's argument that the trial justice restricted the doctrine of incipient dedication to roadways. The state takes issue with the trial justice's finding that "[n]o common law rule existed in 1909—and no common law rule exists now—on which the Plattors could have relied to manifest their supposed intention to create an incipient dedication of an easement over the Beach Area, merely by depicting it on the 1909 Plat." The state argues that this determination is at odds with Warwick Sewer Authority, 45 A.3d at 501, where this Court applied the doctrine of incipient dedication to non-roadways. In that case, the landowner-defendant recorded a plat map, wherein a portion of the subdivision was depicted as "dedicated to the City of Warwick." Id. at 495. In determining whether the landowner expressed manifest intent, this Court concluded that the plat map "sufficiently and unambiguously evidence[d] Mr. Carlone's intent to dedicate the land in question to Warwick for general public use." Id. at 501.

Here, the trial justice did not find the doctrine of incipient dedication inapplicable to the dedication of a beach. Rather, he found that the Plattors' intent could not be easily presumed from their recordation of the 1909 Plat and the word "Beach" shown on it, in contrast with the presumption of incipient dedication of roadways. Further, it is important to note the significant

difference between the facts present in Warwick Sewer Authority and those in the instant case. In Warwick Sewer Authority, 45 A.3d at 495, the recorded plat clearly indicated that the property was "dedicated to the City of Warwick." Here, there is no such language demonstrating a manifest intent to dedicate.

"[T]he trial justice was called upon to make a factual determination based upon the evidence then before him." Robidoux, 120 R.I. at 435, 391 A.2d at 1155. He carefully considered the lines and markings of the 1909 Plat and Indenture before finding that the instruments did not reveal the Plattors' manifest intent to dedicate the beach area. We find no error.

## D

## Extrinsic Evidence

While we could end our analysis with our determination that the trial justice did not err in concluding that the Plat and Indenture do not demonstrate manifest intent to dedicate, we will nevertheless address the state's arguments concerning extrinsic evidence. The trial justice found the Plat and Indenture unambiguous and therefore could not consider extrinsic evidence to vary the recorded plat.[22] Assuming (in an arguendo manner) that he had found the instruments ambiguous, however, the trial justice offered his analysis of the extrinsic evidence and concluded that such evidence did not reveal the Plattors' manifest intent to dedicate the beach area.

In his analysis, the trial justice, without detailed discussion, found that the most important extrinsic evidence was: the first deeds out of the Plat; the documents related to the platted area that were created leading up to the Plat and Indenture's recording; and the expert testimony

---

[22] "In the absence of a finding that the recorded plat is ambiguous, we know of no authority that permits a trial justice to go beyond the plat and entertain parol or extrinsic evidence to vary the terms of a writing." Newport Realty, Inc. v. Lynch, 878 A.2d 1021, 1034 (R.I. 2005).

about the meaning of the Plat's lines and markings. After considering this body of evidence, the trial justice concluded that any ambiguity in the 1909 Plat and Indenture supported the position that the Plattors did not intend to dedicate an easement to the public over the beach area. In support of this finding, he noted that the first deeds out of the 1909 Plat that reserve "beach rights" were not, contrary to the state's contention, referring to a public easement in the beach, but rather to "preexisting covenants that landowners might have had with these third parties." The trial justice was also persuaded by the evidence that the line of foot of bank represents a geographic feature and not a boundary.

The state challenges the trial justice's findings and asserts that the extrinsic evidence demonstrates manifest intent to dedicate. It faults the trial justice for not considering various pieces of such evidence and argues that the trial justice placed too much weight on the post-1909 deeds that listed the "Atlantic Ocean" as the property's southerly boundary. At bottom, the state's arguments are criticisms of the trial justice's analysis of the evidence or his failure to mention pieces of evidence. "We reject the suggestion that a trial justice must resolve every disputed factual contention that may arise during a trial." Notarantonio, 941 A.2d at 147.

We also reject the state's argument that the trial justice placed too much reliance on the deeds out of the 1909 Plat that refer to the Atlantic Ocean as the southerly boundary. In his discussion of the extrinsic evidence, the trial justice stated that the original first deeds out were among the most probative evidence in determining the Plattors' intent. The majority of the deeds out of the Plat listed the Atlantic Ocean as the southerly boundary. Additionally, many retained "seaweed rights," so that the grantor could return to the beach to remove seaweed. The trial justice also heard testimony about a deed wherein a set of Plattors, the Saunderses, retained the right to re-enter and repossess the land if the grantee breached a condition. There was also

testimony about deeds that contained a warranty to defend against anyone claiming superior title and covenants against encumbrances. In Priestley's testimony, he stated that such reservations and warranties are inconsistent with the assertion that the Plattors had dedicated the beach area to the public.

"The trial justice's role in the fact-finding process includes the drawing of inferences. * * * His findings will stand even though another equally reasonable set of inferences might be drawn from the evidence." Robidoux, 120 R.I. at 435-36, 391 A.2d at 1155. Accordingly, while there may be some evidence to the contrary, we agree that the extrinsic evidence does not reveal the Plattors' manifest intent to dedicate the beach area to the public. There was no error.

## IV

### Conclusion

Over one hundred years ago, five intrepid, longtime "South County" property owners set out to create a residential area by the sea. It is doubtful that they could have imagined the present litigation. In gleaning their intent, the trial justice did not err in finding that the 1909 Plat and Indenture do not reveal manifest intent to dedicate the over-two-mile stretch of beach in Misquamicut to the public. He did so only after he carefully examined the lines and markings on the instruments. Although the trial justice's inquiry could have ended there, he nonetheless provided an alternative examination of the extrinsic evidence to determine whether it evinced manifest intent and, in our opinion, he correctly found that it did not. For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to that tribunal.







## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Peter F. Kilmartin, Attorney General of the State of Rhode Island v. Joan M. Barbuto, et al. |
| **Case Number** | No. 2015-195-Appeal.<br>(WC 12-579) |
| **Date Opinion Filed** | May 2, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Brian P. Stern |
| **Attorney(s) on Appeal** | For State:<br>Michael L. Rubin<br>Department of Attorney General<br><br>Gregory S. Schultz<br>Department of Attorney General<br><br>For Defendants:<br>William R. Landry, Esq.<br>Matthew J. Landry, Esq.<br><br>For Defendant Intervenors:<br>Justin T. Shay, Esq.<br>Leah L. Miraldi, Esq.<br>Patricia A. Buckley, Esq. |